# In the United States Court of Federal Claims

**No. 15-645C**
**(Bid Protest)**
**(Filed: October 2, 2015)** [1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | Post-award Bid Protest; 28 U.S.C. |
| **CADDELL CONSTRUCTION** | * | § 1491(b)(1); Omnibus Diplomatic |
| **COMPANY,** | * | Security and Antiterrorism Act of 1986, |
| | * | 22 U.S.C. § 4852; Statutory |
| Plaintiff, | * | Interpretation; Total Business Volume; |
| | * | Similar Work Requirement; Agency's |
| v. | * | Failure to Follow Government |
| | * | Accountability Office's Recommendation. |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| **PERNIX GROUP, INC.,** | * | |
| | * | |
| Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Dirk Haire, Alexa Santora, P. Sean Milani-nia, and Sonia Tabriz, Fox Rothschild LLP, 1030 15th Street, NW Suite 380 East, Washington, D.C. 20005, for Plaintiff.

Benjamin Mizer, Robert E. Kirschman, Jr., Deborah Bynum, and Sosun Bae, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

J. Randolph MacPherson and Rebecca Bailey Jacobsen, Halloran & Sage, LLP, 1717 Pennsylvania Avenue, NW, Suite 675, Washington, D.C. 20006, for Intervenor.

---

[1]     The Court issued this opinion under seal on September 25, 2015, and directed the parties to file proposed redactions by October 2, 2015.  The Court publishes this Opinion indicating redactions by asterisks "[***]."

---

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD**

---

**WILLIAMS,** Judge**.**

This post-award bid protest comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR"). Plaintiff, Caddell Construction Company ("Caddell"), challenges the Department of State, Bureau of Overseas Building Operations' ("DOS") award of a contract to Pernix Group, Inc. ("Pernix") for the construction of a New Embassy Compound in Maputo, Mozambique. Plaintiff claims that Pernix was ineligible for award under the Omnibus Diplomatic Security and Antiterrorism Act of 1986 ("the Act") because Pernix had not demonstrated either the total business volume or the performance of similar work required by the Act. Plaintiff also asserts that DOS erred in evaluating Pernix's price and improperly disregarded the Government Accountability Office's ("GAO") determination that Pernix was ineligible for award. Plaintiff requests that the Court declare the award unlawful and order DOS to terminate Pernix's contract and award the contract to Caddell.

On August 21, 2015, Caddell filed three additional protests challenging DOS' prequalification of Pernix for similar construction projects in Niger, Mexico, and Papua New Guinea. Caddell Constr. Co. v. United States, No. 15-912C (Fed. Cl. Aug. 21, 2015); Caddell Constr. Co. v. United States, No. 15-913C (Fed. Cl. Aug. 21, 2015); Caddell Constr. Co. v. United States, No. 15-914C (Fed. Cl. Aug. 21, 2015). Because these cases involve identical issues of statutory interpretation of the total business volume and similar work requirements under the Act, the parties requested that the Court stay proceedings in those actions pending resolution of the instant protest. The Court granted this request and entered Orders staying proceedings on August 24, 2015.

During argument on September 10, 2015, the Court orally denied the instant protest in part, upholding DOS' interpretation of the Act's total business volume and similar work requirements. This decision confirms and memorializes that oral ruling.[2]

**Findings of Fact**[3]

**DOS' Issuance of the Solicitation and Pre-Qualification Analysis**

On February 2, 2014, DOS issued a Notice of Solicitation for the construction of a New Embassy Compound in Maputo, Mozambique. AR 1-3. This project was to involve the "construction and commissioning" of a New Office Building, Marine Security Guard Quarters,

---

[2]     The Court ordered further briefing on Caddell's challenge to the agency's evaluation of Pernix's price. Tr. 120: 7-22 (Sept. 10, 2015); Order, Caddell v. United States, No. 15-645C (Sept. 10, 2015).

[3]     These findings of fact are derived from the AR. Additional findings of fact are in the Discussion.

shops, Storage and Maintenance Facilities, Vehicle and Pedestrian Access Control Pavilions, a utility building, a bathhouse/cabana, and a Vehicle Parking Structure, on a site totaling approximately 4 hectares.  AR 1.  The resulting award was to be a firm fixed-price contract.  Id. The estimated construction cost provided to prospective offerors in the Notice of Solicitation was $160-$210 million.  Id.  The procurement consisted of two phases – Phase I, in which DOS would pre-qualify offerors pursuant to the requirements of the Act and security clearance requirements, and Phase II, in which DOS would evaluate pre-qualified offerors' technical and price proposals.  Id.  The project was anticipated to last for 33 months, with work beginning between November 1, 2014, and February 1, 2015.  AR 134.

The February 3, 2014 Notice of Solicitation informed offerors that award was limited to a "United States person" as defined by the Act.  AR 2.  Section 4852(c)(2) of the Act provides:

(2) the term "United States person" means a person which –
(A) is incorporated or legally organized under the laws of the United States, including State, the District of Columbia, and local laws;
(B) has its principal place of business in the United States;
(C) has been incorporated or legally organized in the United States—
(i) for more than 5 years before the issuance date of the invitation for bids or request for proposals with respect to a construction project under subsection (a)(1) [a bid on a diplomatic construction or design project which has an estimated total value exceeding $10,000,000]; and
(ii) for more than 2 years before the issuance date of the invitation for bids or request for proposals with respect to a construction or design project which involves physical or technical security under subsection (a)(2);
**(D) has performed within the United States or at a United States diplomatic or consular establishment abroad administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid;**
**(E) with respect to a construction project under subsection (a)(1), has achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the date specified in subparagraph (C)(i);**
(F) (i) employs United States citizens in at least 80 percent of its principal management positions in the United States,
(ii) employs United States citizens in more than half of its permanent, full-time positions in the United States, and
(iii) will employ United States citizens in at least 80 percent of the supervisory positions on the foreign buildings office project site; and
(G) has the existing technical and financial resources in the United States to perform the contract.

22 U.S.C. § 4852(c)(2)(A)-(G) (2012) (emphasis added).

To be pre-qualified, offerors were required to complete "Certifications Relevant to Public Law 99-399, Statement of Qualifications for Purpose of Section 402[4] of [the Act]" ("Statement of Qualifications").  AR 2.  The Notice of Solicitation stated:

> To demonstrate performance of similar construction work for purposes [of the Act], the offeror needs to provide information demonstrating that it has successfully completed in the United States or at a U.S. diplomatic or consular mission a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of <u>approximately $120 million</u>.

Id.  (emphasis in original).  The Notice of Solicitation further provided that the Contracting Officer would determine whether the information provided by each offeror was sufficient.  Id.  With respect to information missing from an offeror's prequalification information, the Notice of Solicitation stated:

> The Offeror shall submit sufficient documentation to allow DOS to evaluate its capabilities with the qualification criteria listed.  Submissions that are missing the required information or otherwise do not comply with the submission requirements may be eliminated from consideration at the Contracting Officer's determination.

Id.  Submission of the pre-qualification information was due on March 6, 2014 at 3:00 p.m.  AR 3.

The text of the Statement of Qualifications to be filled out by offerors was set forth in DOS' regulations implementing the Act and contained definitions of terms in the Act.  AR 4-15, 35-53; 48 C.F.R. § 652.236-72 (2015).  With respect to Section 4852(c)(2)(E), the total business volume requirement, DOS' regulations contained the following definitions:

> 3 years of the 5-year period before the date specified in subparagraph (C)(i) means the three to five calendar year period immediately preceding the issuance date of this solicitation.

> Total business volume means the U.S. dollar value of the gross income or receipts reported by the prospective bidder/offeror on its annual federal income tax returns.

> Years means the business year of the prospective bidder/offeror, as reflected on its annual federal income tax returns.

See AR 11.  With respect to Section 4852(c)(2)(D), the similar work requirement, DOS' regulations contained definitions for each element – complexity, type of construction, and value – as follows:

---

[4]    "Section 402" refers to the Public Law version of the Act before codification. The Court will refer to the codified version of the Act at 22 U.S.C. § 4852(c) (2012).

"COMPLEXITY" – This term refers to the physical and technical size and demands of the project.

"TYPE OF CONSTRUCTION" – This term refers to the overall nature of the facilities to be built, including the kinds of materials to be used. Thus, if the contract will require the construction of a multi-story office building, the prospective offeror will be expected to demonstrate experience with facilities of this type.

"VALUE" – This term refers to the total contract price of the project, not to the profit or loss to the contractor.

AR 8; see 48 C.F.R. § 652.236-72.

Nine offerors, including Pernix and Caddell submitted pre-qualification statements. With respect to the total business volume questions, Pernix listed its gross receipts for the years 2009 to 2013 as follows:

> 2013: [***]
> 2012: [***]
> 2011: [***]
> 2010: left blank
> 2009: [***]

AR 11. Pernix listed five projects it believed were similar, including a New Embassy Compound in Suva, Fiji, valued at $50,204,527, the Baghdad Diplomatic Support Center, valued at $120,335,028, and the Baghdad Police Academy, valued at $102,524,145. AR 9-10. Pernix listed itself as the majority partner and the prime contractor on the Baghdad Diplomatic Support Center, which had been completed by the Pernix-Serka Joint Venture. AR 9, 11. Pernix did not enter a response to the question requesting the specific percentage of this project that it performed as a co-venturer. AR 11. Pernix described the type of construction of the Baghdad Diplomatic Support Center as "design-build" and the complexity as follows:

Facilities under construction include, but are not limited to: housing units, an office building, an overhead cover system for existing gym, MWR [Morale Welfare Recreation Facilities], and DSH Hospital facility, guard towers, water and wastewater treatment plants. This project was a fast tract-design build, and included the fit-out of facilities to be used for housing, recreational, storage, office, and general work and maintenance areas. It was executed within an existing U.S. Government compound, requiring tight coordination with USG, and contractor personnel to ensure limited disruption to the existing facilities' operation. This was executed in Baghdad, Iraq with high security profile and extreme local logistics requirements.

AR 9.

In its pre-qualification submission with respect to total business volume, Caddell listed its gross business receipts per year as follows:

2012: Not available
2011: [***]
2010: [***]
2009: [***]
2008: [***]

AR 49. For the similar project requirement, Caddell listed seven projects ranging in value from $106,110,638 to $332,822,890.  AR 84-90.  For four projects, Caddell noted that it was a joint venture partner and specified that it was a [***] joint venture partner for two projects and a [***] joint venture partner for the other two.  Id.  Caddell left blank its answer to the question asking for the percentage of the project it performed as a co-venturer.  AR 49.

On March 11, 2014, DOS' legal advisor, Dennis J. Gallagher, issued a memorandum to Jimmy Lai, the Contracting Officer,[5] containing his analysis of the offerors' pre-qualification submissions.  Mr. Gallagher wrote:

> For purposes of this review, I have considered new general office building construction whether on a design-build or design-bid-build basis to be similar in complexity and type of construction to the Paramibo project[6] and consistent with the FedBizOpps announcement have considered such experience to be roughly similar in value if at least one completed eligible project has a contract value of approximately $120 million or more.
>
> As previously noted by L/BA, there continues to be uncertainty as to the application of the business volume requirement of Section 402 of P.L. 99-399 [the Act].  In particular, there are inconsistent decisions by the Court of Federal Claims and the Government Accountability Office as to whether the business volume requirement may be satisfied by cumulative business volume in 3 years of the 5 year period prior to the solicitation exceeding the value of the project or whether business volume in each of the three years of the five year period is required.  For purposes of this review, I have applied the cumulative business volume standard and used the low-end approximate construction cost, but note the potential bid protest vulnerability where the offeror does not meet the business volume test for each of the three years at the high-end estimate.

AR 94-95 (footnote omitted).

---

[5]     Caddell points out that Mr. Lai used the title Contract Specialist on some documents and Contracting Officer on others, and that James G. Thomas, Jr. also used the title Contracting Officer.  Pl.'s Resp. at 28.  Pernix counters that both Messrs. Lai and Thomas were warranted Contracting Officers and that Mr. Lai functioned both as a Contracting Officer or Contract Specialist depending on the circumstances.  Intervenor Reply 19-20, n. 13.  Although Caddell suggests that Mr. Lai's conduct in functioning in a dual capacity was somehow irregular, the record does not support this suggestion.

[6]     The record does not indicate what the "Paramibo project" was.

DOS' legal advisor determined that Caddell met the pre-qualification requirements and that Pernix "appeare[d] to meet [the Act's] criteria on the basis of the Baghdad Diplomatic Support Center, which exceeds $120 million." AR 96. DOS' legal advisor noted that "Pernix's reported business volume me[t] the cumulative but not 3 of 5 year standard," i.e., Pernix's business volume over three years, if viewed cumulatively, exceeded the $160 million low-end estimated cost of the instant project in the solicitation, but not if viewed year by year individually. Id. Caddell's business volume totals met the requirement on both an individual year basis and cumulatively. AR 95. DOS' legal advisor determined that eight out of nine offerors should be pre-qualified. AR 98. On April 4, 2014, Contracting Officer Lai adopted DOS' legal advisor's recommendations and deemed the eight offerors eligible to participate in Phase II of the procurement. AR 101-02.

**Caddell's GAO Protests**

On January 9, 2015, Caddell filed two protests with GAO contesting DOS' determination that Pernix and another offeror, Framaco International, Inc. ("Framaco"), were properly pre-qualified pursuant to the Act.[7] Caddell argued that Pernix did not meet the Act's definition of a United States person because it had not achieved at least $160 million of business volume for each of three years individually in the five-year period. AR 381-82. Caddell urged GAO to follow its previous decisions measuring total business volume by discrete year instead of cumulatively over three years. AR 299-301. Caddell also argued that Pernix did not meet the Act's definition of a United States person because it lacked performance of similarly valued construction work. Specifically, Caddell claimed that Pernix's only project of similar value was the $120 million Baghdad Diplomatic Security Center, but, because it performed this project as part of a joint venture, Pernix should not itself have been able to claim the full amount, but only the value up to the percentage of its stake in the joint venture. AR 298.

The Government and Pernix countered that DOS' interpretation of the Act as measuring total business volume cumulatively over three years was correct and relied on Grunley Walsh International, LLC v. United States, 78 Fed. Cl. 35 (2007) ("Grunley"), which held that the Act should be interpreted to compute total business volume cumulatively over three years. AR 289-90, 315-17.

On April 20, 2015, GAO sustained Caddell's protests and determined that Framaco and Pernix were not United States persons because they did not meet the total business volume requirement for each of the three years individually. AR 365-84. GAO denied Caddell's protest that Pernix failed to meet the similar work value requirement because Caddell offered no legal support for its argument that the Act required DOS to prorate an offeror's share in a joint venture. AR 383-84.

With respect to the total business volume requirement, GAO relied on its June 15, 2007 decision, Caddell, B-298949.2, which interpreted the total business volume requirement to mean that offerors achieved a business volume equal to or greater than the value of the project in each of 3 years within the 5-year period. 2007 CPD ¶ 119 at 10 (Comp. Gen. June 15, 2007). GAO based this decision on its stated concern that an interpretation affording a cumulative 3-year business value would "read out" the three-year language because an offeror could meet the

---

[7]        DOS ultimately determined that [***]. AR 1042.

requirement by presenting a very large business volume in one year and zero in the other two, but still pre-qualify.  Id. at 10.

GAO also considered the provision to have an "element of ambiguity" and considered the Act's legislative history.  Id. at 9-10.  As described by GAO, the Committees on Foreign Relations from both houses of Congress used "almost identical language to describe these provisions . . . ."  Id. at 10.  GAO quoted the Senate Committee on Foreign Relations as stating:

> -- The firm must have performed services similar to the complexity, cost, and construction-type to that of [the] project open for bid.
>
> -- The firm must have achieved a total business volume in 3 of the previous 5 years at least equal to the value of the project being bid.  The previous two requirements will help ensure that a firm is technically capable to carry out a given project.

Id. (emphasis in original) (quoting S. Rpt. No. 99-304, at 15 (1986); see also H. Rpt. No. 99-494, at 17 (1986) (footnote omitted)).  Based upon this legislative history, GAO posited:

> Given these concerns [of an offeror's technical capability], it is troubling that the agency's interpretation of the business volume requirement will result in the eligibility of an offeror who has not, in any of the previous 5 years before the solicitation was issued, performed a project of this magnitude.

Id.

On June 23, 2015, the day after Caddell filed its complaint with this Court, DOS notified GAO that it declined to implement GAO's recommendation.  AR 387-89.  DOS stated that computing total business volume on a cumulative basis was its "consistent and long-standing administrative interpretation" of the Act.  AR 387.  DOS concluded:

> The Department of State has never previously declined to implement GAO's recommendations and the Department understands that abiding by GAO bid protest decisions with which we disagree is essential to the functioning of the bid protest system.  In the previous case [Grunley], however, we attempted to follow GAO's interpretation of the statute, only to be told by the Court of Federal Claims that our long-standing administrative interpretation was correct and that GAO's ruling was arbitrary and capricious.  In these circumstances, the Department of State has concluded that Caddell rather than the Department of State should be required to present GAO's position to the Court of Federal Claims.  The Department believes Caddell should have presented its protest to the Court of Federal Claims in the first place.

> *      *      *

> The issue presented in Caddell's protests will be repeated in virtually every prequalification for solicitations for New Embassy Compounds . . . . Unless the law is changed or repealed, bid protests will likely continue until the issue is

decided by the Court of Appeals for the Federal Circuit or possibly by the U.S. Supreme Court.

AR 388-89.

Caddell and Pernix were notified of the award to Pernix on June 17, 2015. AR 1072-75. Caddell filed its bid protest in this Court on June 22, 2015. The Government voluntarily stayed performance until the Court issues a decision in this matter. Briefing was completed on August 21, 2015, and oral argument was held on September 10, 2015.

## Discussion

### Jurisdiction and Standard of Review

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b). The Court evaluates bid protests under the Administrative Procedure Act's standard of review for an agency action. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). This Court will not disturb an agency's procurement decision unless the Court finds that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014). The Court will set aside an agency's decision as arbitrary and capricious if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). The Court will not overturn an agency decision "even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations" if the Court finds a reasonable basis for the agency's action. Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

If this Court finds that the agency acted arbitrarily or capriciously or contrary to law, the plaintiff must also show that it was prejudiced by this conduct to prevail. Bannum, 404 F.3d at 1351. This requires the plaintiff to demonstrate that there was a "substantial chance" the plaintiff would have received the contract award but for the Government's errors in the procurement process. Id. at 1358. Under Rule 52.1 of the Rules of the Court of Federal Claims, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record. See id. at 1354. Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record. Id.

### The Act Requires DOS to Assess Total Business Volume Cumulatively Over Three Years

Caddell argues that DOS acted arbitrarily and capriciously by pre-qualifying Pernix when Pernix did not meet the total business volume requirement. Pl.'s Mot. at 11-15. Caddell contends that DOS incorrectly interpreted a provision of the Act in assessing Pernix's total

business volume by totaling gross annual receipts over three years on a cumulative basis, instead of evaluating Pernix's business volume per year for each of three years out of five. <u>Id.</u> at 12-15.

The Act imposes a business volume requirement in defining "a United States person" as an entity that:

> with respect to a construction project under subsection (a)(1) [a diplomatic construction or design project valued over $10,000,000], has achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the date specified in subparagraph (C)(i).

22 U.S.C. § 4852(c)(2)(E).

Statutory interpretation starts with the plain language of the text. <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997). If the Court finds the statutory language unambiguous, then that plain language controls the text's meaning**.** <u>See</u> <u>Carcieri v. Salazaar</u>, 555 U.S. 379, 387 (2009); <u>Shoshone Indian Tribe of the Wind River Reservation v. United States,</u> 364 F.3d 1339, 1345 (Fed. Cir. 2004). A Court must construe the plain language of a statute "so that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" <u>Grunley</u>, 78 Fed. Cl. at 40 (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001)).

Here, the provision in question, Section 4852(c)(2)(E), states that a qualifying entity must have "achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before [the solicitation date]." This provision directs that the government will measure "total business volume" "value" by aggregating the business volume over a three-year period, not measuring the business volume of each individual year separately. This Court, like the Court in <u>Grunley</u>, deems "total" to be an essential statutory term which cannot be read out or ignored. As stated in <u>Grunley</u>:

> The inclusion of the word 'total' modifies the term 'volume' and informs the reader that the volume in question will be, as plaintiff states, 'a product of addition.' Measuring the three years cumulatively gives meaning to the word 'total' and avoids a construction that leaves language 'superfluous, void, or insignificant.'

<u>Id.</u> (footnote omitted) (citing <u>Duncan</u>, 533 U.S. at 174). The <u>Grunley</u> Court derived its definition of total as a "product of addition" from Merriam-Webster's Collegiate Dictionary (11th ed. 2003). <u>Id.</u> Other dictionary definitions support interpreting total business volume on a cumulative basis. Webster's Third New International Dictionary of the English Language provides a definition of total as "a result of addition" and lists as synonyms "aggregate," "sum," "column," and "cumulative." 2414 (2002). The American Heritage Dictionary of the English Language defines total as "[a]n amount obtained by addition; a sum." 1892 (3d ed. 1992).

An interpretation that the requirement is cumulative squares with the plain text of the statute by avoiding either removing the word "total" from the provision or inserting the word "separate" or "individual" before "years." Indeed, there is no countervailing language requiring the Government, in measuring the value of "total business volume," to isolate three individual years and require that receipts from each single year meet a volume approaching the overall

project value.  Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54 (1982) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."); SEC v. Zahareas, 272 F.3d 1102, 1106-07 (8th Cir. 2002) ("Courts are obligated to refrain from embellishing statutes by inserting language that Congress has opted to omit.") (alteration and citations omitted).

GAO's articulated rationale for reading the total business volume as per year rather than cumulative is predicated on a presumption that it would be wrong to permit "a very large business volume in one year and zero in the other two" and thus necessary to require a "steady volume of one-third the value of the project" per year.  Caddell, B-298949.2, 2007 CPD ¶ 119 at 11.  But this gloss on the statutory language injects requirements nowhere found in the statute that receipts had to be evenly divided among the three years and meet the total business volume in each of three years.  In contrast, the definition of total connotes adding up the receipts over a three-year period no matter what the discrete gross receipts in those individual years might be.  The language permitting totaling gross receipts in any three years of the five preceding the solicitation indicates that it matters not what three years an offeror chooses to identify.  Nor does the statute address what the gross receipts in each of those three years individually had to be – so long as they "totaled" at least $160 million.

An interpretation that the total business volume requirement is cumulative is consistent with the purpose of the Act – which sets forth requirements for construction projects that span multiple years.  See BASR P'ship v. United States, 795 F.3d 1338, 1343 (Fed. Cir. 2015) ("[W]e cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").  The Act addresses the building of new embassy compounds, which are "known to be multi-year projects." Grunley, 78 Fed. Cl. at 41. Here, the project is scheduled to be completed in 33 months, just shy of three years, making the total business volume requirement, if read cumulatively, consistent with the length of the project.  AR 134.  In contrast, imposing a more rigorous per-year requirement for meeting business volume would force a prospective offeror to have completed triple the volume of the project's estimated value in a three-year period in order to prequalify.  This reading would impose an unduly onerous qualification requirement and yield less competition.

As the Court in Grunley observed:

> The cumulative three-year requirement does not contradict the stated purpose of ensuring that an offeror has performed projects of similar magnitude, cost, and type. The projects being bid on are known to be multi-year projects. Both the DOS and the offeror knew that these projects are completed over a period of multiple years. Offerors submit proposals that assume that the total cost will be spread across several years. This fits hand in hand with the three-year cumulative business volume requirement. Congress created a system whereby offerors display their capability to perform multi-year projects by showing their total business volume over three years out of the previous five.

78 Fed. Cl. at 41.

Caddell places undue reliance on DOS' regulations defining "total business volume" as "the U.S. dollar value of the gross income or receipts reported by the prospective bidder/offeror

on its <u>annual</u> federal income tax returns." Pl.'s Reply 15; 48 C.F.R. § 652.236-72 (emphasis added). Caddell seizes on the fact that DOS is looking to "annual" income tax returns as the proper reporting device to reflect gross receipts, to reach an unwarranted conclusion that individual yearly business volume must be the measure of the total business volume requirement. Pl.'s Reply at 15. This attempt to imbue the word "annual" with undue significance ignores the fact that "annual" read in the context of the regulation merely indicates the type of income tax returns to be referenced. <u>See id.</u> at 16. In contrast to Caddell's strained interpretation of "annual," the regulation's express designation of annual tax "returns" in the plural refers to multiple years of "annual" tax receipts, not just a single year. 48 C.F.R. § 652.236-72.

Because the unambiguous meaning of the statute controls, it is not necessary to consider legislative history. <u>Connecticut Nat'l Bank</u>, 503 U.S. at 254. Nonetheless, the legislative history here is consistent with an interpretation that the total business volume requirement is to be measured over three years. Congress was well aware that new embassy compound construction requires multiple years to complete.[8] H.R. Rep. No. 99-494, at 17 (1986); S. Rep. No. 99-304, at 15 (1986). The House Report specifies that an offeror's prior business volume in three years had to "be at least equal to the value of the project being bid," stating:

> The firm must have achieved a total business volume in 3 of the previous 5 years <u>at least equal to the value of the project being bid</u>. The previous two requirements will help ensure that a firm is technically capable to carry out a given project.

<u>Id.</u>, <u>as</u> <u>reprinted</u> <u>in</u> 1986 U.S.C.C.A.N. 1865, 1883 (emphasis added). Here, for purposes of assessing whether an offeror's past total business volume is "at least equal to the value of the project being bid," an offeror's "total business volume" must be aggregated over three years so as to be meaningfully compared to the project's overall value, which here spans 33 months. <u>See id.</u>

In sum, based upon the clear language of the Act, DOS acted reasonably when it pre-qualified Pernix by assessing Pernix's total business volume for three years on a cumulative basis.

**<u>DOS Rationally Declined to Implement GAO's Recommendation</u>**

Plaintiff claims DOS erred in not following GAO's recommendation and in failing to articulate a rational basis for disregarding GAO's recommendation. Pl.'s Mot. at 28-29. This Court recognizes the long-standing expertise of GAO in the bid protest arena and accords its decisions due regard. <u>Integrated Bus. Sols., Inc. v. United States</u>, 58 Fed. Cl. 420, n.7 (2003); <u>see</u> <u>The Centech Grp. v. United States</u>, 78 Fed. Cl. 496, 506-07 (2007). However, it is well established that GAO recommendations do not bind agencies. <u>Kingdomware Techs., Inc. v. United States</u>, 754 F.3d 923, 929 (Fed. Cir. 2014) (citing <u>Honeywell</u>, 870 F.2d at 647-648). The Federal Acquisition Regulation contemplates that agencies will not always follow GAO

---

[8]    Congress recognized the multi-year duration of embassy construction projects when drafting the definition of a "United States Person," 22 U.S.C. § 4852(c)(2)(C). H.R. Rep. No. 99-494, at 17 ("Some length of business provision is necessary to establish this qualification, <u>as many construction projects require 3 or more years for completion</u>." (emphasis added)).

recommendations.[9]  See AR 387-389; see also Turner Constr. Co., Inc. v. United States, 94 Fed. Cl. 561, 571-73 (2010) (finding an agency acted irrationally in following a GAO recommendation), aff'd 645 F.3d 1377 (Fed. Cir. 2011); Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 711 (finding an agency's decision to follow corrective action proposed by GAO in an email to be irrational) aff'd 691 F.3d 1374 (Fed. Cir. 2012).

Here, DOS had ample reason to interpret the Act in the manner it did and ample reason to opt not to follow GAO's recommendation.  DOS explained:

> The Department of State has never previously declined to implement GAO's recommendations and the Department understands that abiding by GAO bid protests with which we disagree is essential to the functioning of the bid protest system. In [Grunley], however, we attempted to follow GAO's interpretation of the statute only to be told by the Court of Federal Claims that our long-standing administrative interpretation was correct and that GAO's ruling was arbitrary and capricious. . . . Unless the law is changed or repealed, bid protests will likely continue until the issue is decided by the Court of Appeals for the Federal Circuit or possibly the U.S. Supreme Court.

AR 388-89.  Given the conflict on the statutory interpretation issue in the two bid protest fora, the agency faced a dilemma – no matter which forum it followed, it would be departing from the other's ruling.  The rationality vel non of an agency's decision to follow either a trial court decision or a GAO decision depends on the reasoning articulated by the tribunal.  Honeywell Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("[A] procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision was irrational.").  In departing from GAO's ruling here, the agency relied upon a Court of Federal Claims decision on point and returned to its long-standing interpretation of the Act. AR 387-89; see Grunley, 78 Fed. Cl. at 38.  In staking out its statutory interpretation, the agency reasonably construed the total business volume requirement both in the context of the statute as a whole, and in the context of the requirements for this 33-month project.  As explained above, this Court finds the agency's interpretation not only to be reasonable, but also to be legally correct. So too, DOS' Notification to GAO set forth sufficient documentation explaining its reasoning for

---

[9]     Federal Acquisition Regulation 33.104(g) provides:

> Notice to GAO. If the agency has not fully implemented the GAO recommendations with respect to a solicitation for a contract or an award or a proposed award of a contract within 60 days of receiving the GAO recommendations, the head of the contracting activity responsible for that contract shall report the failure to the GAO no later than 5 days after the expiration of the 60-day period. The report shall explain the reasons why the GAO's recommendation, exclusive of costs, has not been followed by the agency.

48 C.F.R. 33.104(g) (2007).

not adopting GAO' recommendation based on DOS' own interpretation of the Act as well as on its reasonable reliance on <u>Grunley</u>. AR 387-89.

### DOS' Evaluation of Pernix's Similar Work Was Reasonable

Caddell also challenges DOS' application of the Act's similar work requirement. Section 4852(c)(2)(D) contains the requirement for similar work in defining a "United States person" as an entity that:

> has performed within the United States or at a United States diplomatic or consular establishment abroad administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid.

22 U.S.C. § 4852(c)(2)(D).  Plaintiff claims DOS' action was arbitrary and capricious in two respects – its calculation of similar value and its evaluation of projects of similar type and complexity.  Pl.'s Mot. at 15-18.

### Similar Value

Regarding similar value, Caddell asserts that DOS was obligated to split the total value of past joint venture projects between individual co-venturers by percentage of work performed in order to assess whether one co-venturer performed past work of similar value to the instant project.  Pl.'s Mot. at 17.  Caddell argues that DOS erred in failing to seek clarification of the exact percentage of the Baghdad Diplomatic Support Center performed solely by Pernix as part of the Pernix-Serka joint venture**,** as Pernix had omitted that information from its Statement of Qualifications. Pl.'s Mot. at 17.[10]

To meet the similar value requirement under Section 4852(c)(2)(D), the solicitation asked offerors to identify in their Statement of Qualifications "a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of <u>approximately $120 million</u>." AR 2 (emphasis in original). The Statement of Qualifications also provided a space for offerors to list "one or more similar projects completed by the prospective offeror," with a description of location, type of service, complexity, type of construction, and value of project.  AR 9.

Pernix listed five projects. AR 9-11.  These included the New U.S. Embassy Compound in Suva, Fiji valued at $50,204,527, the Baghdad Diplomatic Support Center valued at $120,335,028, the Baghdad Police Academy Annex valued at $102,524,145, a controlled access area in Suva, Fiji, valued at $10,524,145, and rehabilitation construction work on an existing

---

[10]   Caddell states in its motion that Pernix's "publicly available financial documents" show "Pernix owns a 52 percent stake in the Pernix-Serka JV." From this, Caddell speculates on the amount work attributed to Pernix. Pl.'s Mot. at 17.  However, Caddell does not specify what "publicly available financial documents" it is referencing or rely upon the Administrative Record.  <u>Id.</u>  The Administrative Record states that Pernix was the prime contractor on the Baghdad Diplomatic Support Center and majority owner and managing partner of the JV.  AR 9, 11, 659.

Embassy Compound in Niamey, Niger valued at $27,592,543.  Id.  Three of these projects were joint ventures in which Pernix was the majority partner and served as prime contractor.  Id.

In recommending acceptance of Pernix's Baghdad Diplomatic Support Center as a project of similar value, DOS' legal advisor wrote:

> Pernix appears to meet the [the Act's] criteria on the basis of the Baghdad Diplomatic Support Center, which exceeds $120 million.  Pernix's reported business volume meets the cumulative but not 3 of 5 year standard.

AR 96.  Contracting Officer Lai agreed with DOS' legal advisor's recommendation.  AR 101.

DOS acted reasonably in accepting Pernix's submission of the Baghdad Diplomatic Support Center as work of similar value because this project had a dollar value over the solicitation's minimum of $120 million and Pernix's Statement of Qualifications listed Pernix as the prime contractor and majority partner of the joint venture that performed this project.  AR 9, 11.  The agency reasonably concluded that by acting as the prime contractor for the Baghdad Diplomatic Support Center valued over $120 million, Pernix prequalified for the solicited project.  AR 96; cf. AR 97 (DOS' legal advisor opining that another offeror could claim full credit for a $120 million project as long as that offeror was the prime contractor even if it had only performed 26% of the project).

Further, as GAO found,

> Caddell fails to provide any legal support for its implicit argument that 22 U.S.C. § 4852(c)(2)(D) requires that joint venture projects must be credited on a pro-rated basis.  Without legal support for this argument, we have no basis to sustain the protest.

AR 384; see also Def.'s Mot. at 11; Intervenor's Mot. at 36-37.  Caddell's attempt to import a requirement that DOS assess the value of joint venture projects by splitting the project value between co-ventures by "percentage of performance completed" fails.  Pl.'s Mot at 16-17.  Caddell's hypothecation of this requirement is not supported by any applicable statute, regulation, or term of the solicitation.

Finally, while Caddell points out that Pernix failed to list the percentage of work performed on each project in its Statement of Qualifications, Caddell's submission suffered from the same infirmity.  AR 11, 49.  DOS reasonably exercised its discretion when it accepted both Pernix's and Caddell's Statements of Qualifications as "sufficient documentation" to support both entities' past construction experience.  AR 2, 95-96.

## Similar Type and Complexity

As for similar type and complexity, Caddell argues that that DOS erred by not considering that the Baghdad Diplomatic Support Center built by Pernix involved temporary "containerized housing unit" structures that lacked the "architectural features, finishes, technical

security systems, or classified work typical in embassy construction" required to construct the permanent units in the instant project.  Pl.'s Mot. at 18.[11]

While the record does indicate that there were some temporary modular features in the Baghdad Diplomatic Support Center, there is no suggestion that these were either the only, or the primary, facilities constructed.   AR 658.   Caddell characterizes the distinction between temporary versus permanent structures as an "important aspect" in evaluating the type and complexity of Pernix's past construction projects, but the prequalification requirements did not, instead listing a "new office building" as the predominant aspect of the solicited project – a structure Pernix completed in its Baghdad Diplomatic Support Center.  AR 1, 95.  So too, DOS' prequalification criteria focused on the "overall nature of the facilities" and the "physical and technical size and demands" of the solicited project, with no mention of permanent versus temporary structures.  AR 2, 8; 48 C.F.R. § 652.236-72.

As DOS and Pernix argue, neither the Act nor the solicitation distinguished between temporary and permanent structures, and DOS documented in its Agency Report to GAO that the Bagdad Diplomatic Support Center "involved significant complexity" on par with the instant solicitation.  Def.'s Mot. at 12-13.  The Court agrees.  Pernix submitted a detailed description of the Baghdad Diplomatic Support Center in its Statement of Qualifications stating that Pernix was the prime contractor and the majority partner of the joint venture awarded the contract.  Further, the type of construction was a "design-build" project valued at $120,335,028.  AR 9.  Pernix described the project's complexity in its Statement of Qualifications as:

> Facilities under construction include, but are not limited to: housing units, an office building, an overhead cover system for existing gym, [Morale Welfare Recreation Facility], and DSH Hospital facility, guard towers, water and wastewater treatment plants.  This project was a fast track-design build, and included the fit-out of facilities to be used for housing, recreational, storage, office, and general work and maintenance areas.  It was executed within an existing U.S. Government compound, requiring tight coordination with USG, and contractor personnel to ensure limited disruption to the existing facilities' operation.  This was executed in Baghdad, Iraq with high security profile and extreme local logistics requirements.

Id.   DOS reasonably concluded that the Baghdad Diplomatic Support Center met its prequalification criteria because it involved the construction of an office building on a design-build basis exceeding $120 million," involving "significant complexity due to the security environment and wide array of facilities included."  AR 9, 96, 288.

---

[11]       In support of this argument, Caddell cites a document not in the AR – an unauthenticated website print-out from Pernix's corporate home page summarizing Pernix's work on the Baghdad Diplomatic Support Center.  Pl.'s Mot. at 18, Ex. A.  Caddell attached this print-out as Exhibit A to its motion for judgment on the administrative record, but did not move to supplement the AR.  Because this exhibit is not in the record, the Court does not rely on it.

## **Conclusion**

Defendant's Motion for Judgment upon the Administrative Record is **GRANTED IN PART**, as the Court denies Caddell's grounds of protest challenging DOS' interpretation of the total business volume and similar work requirements and DOS' decision not to follow GAO's recommendation.

Caddell's remaining ground of protest on DOS' evaluation of Pernix's price proposal will be addressed in a separate opinion once briefing is completed.


s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**