# In the United States Court of Federal Claims

### No. 15-645C
### (Bid Protest)
### (Filed: February 10, 2016) [1]

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
                                   *
CADDELL CONSTRUCTION            *
COMPANY,                        *
                                   *
            Plaintiff,          *
                                   *
      v.                        *
                                   *
THE UNITED STATES,              *
                                   *
            Defendant,          *
                                   *
      and                       *
                                   *
PERNIX GROUP, INC.,             *
                                   *
            Intervenor.         *
                                   *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

Post-award Bid Protest; 28 U.S.C. § 1491(b)(1); Omnibus Diplomatic Security and Antiterrorism Act of 1986; Lowest Priced Technically Acceptable Offeror; Misleading Discussions; Price Reasonableness; FAR 15.306; FAR 15.404-1; Price Verification; FAR 14.403; FAR 1.102; Prejudice; Injunctive Relief.

Dirk Haire, Alexa Santora, and P. Sean Milani-nia, Fox Rothschild LLP, 1030 15th Street, NW, Suite 380 East, Washington, D.C. 20005, for Plaintiff.

Benjamin Mizer, Robert E. Kirschman, Jr., Deborah Bynum, and Sosun Bae, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

J. Randolph MacPherson and Rebecca Bailey Jacobsen, Halloran & Sage, LLP, 1717 Pennsylvania Avenue, NW, Suite 675, Washington, D.C. 20006, for Intervenor.

---

[1]     The Court issued this opinion orally on January 22, 2016.  This opinion memorializes the Court's oral ruling.

    The Court issued this opinion under seal on January 28, 2016, and directed the parties to file proposed redactions by February 8, 2016.  The Court publishes this Opinion indicating redactions by asterisks "[***]."

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

In this post-award bid protest, Plaintiff, Caddell Construction Company ("Caddell"), challenges the Department of State, Bureau of Overseas Building Operations' ("DOS") award of a contract to Pernix Group, Inc. ("Pernix") for the construction of a New Embassy Compound in Maputo, Mozambique. This is the second opinion in this case. In the first opinion, the Court denied Caddell's claim that Pernix was ineligible for award under the Omnibus Diplomatic Security and Antiterrorism Act of 1986 ("the Act") because Pernix had not demonstrated either the total business volume or the performance of similar work required by the Act. Caddell Constr. Co. v. United States, 123 Fed. Cl. 469 (2015).

This opinion concerns Caddell's claim that DOS' misleading discussions tainted the pricing evaluation and resulted in an illegal award. DOS admittedly advised the awardee that its price was higher than the Independent Government Estimate ("IGE"), when it was actually [***] lower than the IGE. As such, award was based on a misinformed price, the price competition was skewed, there was no level playing field in what had become a price-based competition, and the procurement process lacked integrity. Given the arbitrary and capricious conduct of this procurement, the Court vacates the award and directs DOS to correct its erroneous discussion letter, afford Pernix the opportunity to revise its pricing based upon an accurate discussion letter, and make a new award decision.

This Court recognizes that typically when discussions are reopened with one offeror, they should be reopened with all offerors. Here, however, two circumstances taken together militate against such relief. First, the misleading discussions only affected the awardee's pricing. All other offerors received accurate information and had an opportunity to submit informed revised offers. Second, the awardee's price and the IGE have been publicly disclosed. This information would give Plaintiff and other offerors an unfair advantage over the awardee in a price re-evaluation. As such, based upon the circumstances of this case, the Court grants this limited injunction.

### Findings of Fact[2]

### The Solicitation and Pre-Qualification

On February 2, 2014, DOS issued a Notice of Solicitation for the construction of a New Embassy Compound in Maputo, Mozambique. AR 1-3 (Solicitation No. SAQMMA-14-R0073).

---

[2]     These findings of fact are derived from the Administrative Record ("AR"). The Court has not corrected grammatical errors in quotations from the AR and the filings. Additional findings of fact are in the Discussion, and in the Court's earlier opinion, Caddell Construction Co. v. United States, 123 Fed. Cl. 469, 471-75 (2015).

This project was to involve the "construction and commissioning" of a new office building, marine security guard quarters, shops, storage and maintenance facilities, vehicle and pedestrian access control pavilions, a utility building, a bathhouse/cabana, and a vehicle parking structure, on a site totaling approximately four hectares. AR 1. The estimated construction cost in the Notice provided to prospective offers was stated to be $160-$210 million. Id.

The procurement consisted of two phases – Phase I, in which DOS would pre-qualify offerors for compliance with statutory and security clearance requirements, and Phase II, in which DOS would evaluate pre-qualified offerors' technical and price proposals. AR 1-2. This was a "lowest price technically acceptable acquisition" to result in a firm fixed-price contract. AR 1, 1067. The project was anticipated to last for 33 months, with work beginning between November 1, 2014, and February 1, 2015. AR 134.

The Solicitation required proposals to be evaluated for price reasonableness under the price analysis techniques provided in FAR 15.404-1. Section M.3 of the Solicitation entitled Evaluation of Price provided:

> M.3.1.  Price proposals will be evaluated for price reasonableness based on the total price proposed for performance of the Building Project as specified in Section B [Pricing] of this solicitation. Analysis shall be performed in accordance with Federal Acquisition Regulation 15.404-1 and Section M [Evaluation Factors for Award] of this solicitation.

AR 239.

## **Phase II Evaluations and Discussions**

Following Phase I of the procurement, four pre-qualified offerors remained in the competition: Caddell, Pernix, Framaco International, Inc. ("Framaco"), and B.L. Harbert International, LLC ("BL Harbert"). AR 1054-55. DOS issued its Request for Proposals ("RFP") following Phase I on September 30, 2014, and these four entities timely submitted proposals.[3] Id. The Technical Evaluation Panel ("TEP") reviewed the proposals and scored them on a pass/fail basis. AR 877. Caddell, Pernix, and BL Harbert received overall "pass" ratings. AR 855. Framaco received a "fail" rating, as it did not meet proposal requirements. Id.

DOS' Bureau of Overseas Building Operations, Program Development Coordination and Support, and Office of Cost Management ("COST") evaluated the price proposals, and issued a memorandum to Contracting Officer Lai setting forth the following price comparison table:

---

[3]     The original proposal submission deadline of December 1, 2014, was extended to January 13, 2015. AR 1054.

|  | (IGE)[4] | Pernix | Framaco | Caddell | BL Harbert |
|---|---|---|---|---|---|
| **CLIN 001,** Construction of New Embassy Compound | [***] | [***] | [***] | [***] | [***] |
| **CLIN 003,** Offsite Landscaping Plan | [***] | [***] | [***] | [***] | [***] |
| **CLIN 004,** Offsite Access Road Improvement Plan | [***] | [***] | [***] | [***] | [***] |
| **CLIN 005,** Offsite Conveyance Plan for Channels A & B | [***] | [***] | [***] | [***] | [***] |
| **CLIN 006,** Offsite Avenida de Marginal Road Improvement Plan | [***] | [***] | [***] | [***] | [***] |
| **CLIN 007,** Fixed Price Security Equipment | [***] | [***] | [***] | [***] | [***] |
| **Total** | $186,932,794 | [***] | [***] | [***] | [***] |

AR 878, 883.

COST separately analyzed each CLIN and its subelements. AR 879-82. Because CLIN 001, the construction of the new embassy compound, accounted for approximately 99% of the overall project based on the IGE, COST provided two charts: the first comparing the offerors' total building costs to complete construction of CLIN 001, and the second comparing the

---

[4]     The IGE was not disclosed to offerors.

offerors' individual building costs to complete construction of the new embassy compound required by CLIN 001.  AR 879-80.  The total construction cost chart set forth the following:

**CLIN 001 Costs**

|  | IGE | Pernix | Framaco | Caddell | BL Harbert |
|---|---|---|---|---|---|
| Total Building and Site Work (TBSW) | [***] | [***] | [***] | [***] | [***] |
| General Requirements (GR) | [***] | [***] | [***] | [***] | [***] |
| Indirects | [***] | [***] | [***] | [***] | [***] |
| General and Administrative (G&A) | [***] | [***] | [***] | [***] | [***] |
| Profit | [***] | [***][5] | [***] | [***] | [***] |
| Total Construction Costs (TCC) | [***] | [***] | [***] | [***] | [***] |

AR 879.  COST noted with respect to total building and site work in CLIN 001 that all but one of the bidders were above the IGE and stated: "[t]here are wide differences from the IGE that ranged from [***] below the IGE from Pernix, to [***] above the IGE from [***]."  Id. (internal parentheticals omitted).  With respect to profit as a percentage of total construction costs, COST wrote:

> Profit - . . . The bids ranged from a low of [***] from Pernix to a high of [***] from Caddell.  One would question Pernix's ability because they have the [***] throughout their proposal and a [***] profit margin.

> [Total Construction Cost] – [***] and Caddell are within [***] of the IGE; Pernix and [***] are at the extremes with [***] the IGE respectively.  The differences ranged from [***] the IGE.

AR 879-80 (emphasis added).

---

[5]      Pernix's profit was erroneously listed as [***]; Pernix's actual profit was [***].  AR 789, 884.  In the COST analysis, Pernix's total construction cost for CLIN 001 is correctly listed as [***].  The parties' briefing, however, continues to assume that Pernix's initial profit figure was [***] and was [***] in its subsequent proposal.  See Def.'s Suppl. Br. 11; Intervenor's Suppl. Br. 6; Pl.'s Suppl. Br. 24.

COST's individual building cost comparison chart for CLIN 001 provided:

**Individual Building Costs in CLIN 001**

|  | IGE | Pernix | Framaco | Caddell | BL Harbert |
|---|---|---|---|---|---|
| [New Office Building] | [***] | [***] | [***] | [***] | [***] |
| [Main Campus Access Pavilion] | [***] | [***] | [***] | [***] | [***] |
| [Consular Campus Access Pavilion] | [***] | [***] | [***] | [***] | [***] |
| [Service Campus Access Pavilion] | [***] | [***] | [***] | [***] | [***] |
| Utility Building | [***] | [***] | [***] | [***] | [***] |
| Support Annex & Shops | [***] | [***] | [***] | [***] | [***] |
| Recreational Facility | [***] | [***] | [***] | [***] | [***] |
| Parking Structure | [***] | [***] | [***] | [***] | [***] |
| [Marine Security Guard Residence] | [***] | [***] | [***] | [***] | [***] |
| Mail Screening Facility | [***] | [***][6] | [***] | [***] | [***] |
| Sitework | [***] | [***] | [***] | [***] | [***] |

AR 880.

COST lastly provided a "Summary and Recommendation" section highlighting specific pricing concerns for each offeror.  AR 882.  For Pernix, COST stated:

---

[6]     Pernix priced this prefabricated facility as [***].

Their proposal is consistently the [***].  Of the four their proposal [***].  <u>COST does not recommend award to Pernix, however if they are to be considered, COST recommends that they verify their costs especially for the [***].</u>

Id.  (emphasis added).

For Caddell, COST stated:

There are substantial differences in Caddell's [***] and their [***] when compared to the IGE.  Overall their estimate is very competitive at [***] above the IGE.  What should be noted is CLIN 001 is priced at [***] the IGE.  The other costs in [***] than the IGE.

Id.

After COST submitted this price analysis, Contracting Officer Lai[7] prepared a competitive range determination memorandum and opened discussions with the four remaining offerors on April 15, 2015.  AR 1054-56.  In the memorandum, Contracting Officer Lai noted:

The highest proposal [***], vis-à-vis the IGE, appears outside the acceptable range for further consideration.  Proposals submitted by [***] compared to the IGE, are considered within the acceptable range.  <u>[Overseas Building Operations]/[Program Development Coordination and Support]/COST does not recommend award to Pernix, but stated that if it is to be considered that the company should have to verify its proposed costs.</u>

AR 1055 (emphasis added).  Contracting Officer Lai concluded that all four prequalifying companies were in the competitive range.  AR 1056.

On April 17, 2015, Contracting Officer Lai sent discussion letters to each of the four offerors and set a deadline for revised proposals of May 4, 2015.  <u>See</u>, <u>e.g.</u>, AR 892-93.  In his discussion letter to Caddell, Contracting Officer Lai wrote:

Caddell's price proposal appears to be [***] in comparison to the Independent Government Estimate (IGE).  The proposed [***] and Caddell may wish to revise its proposed costs here.  Moreover, the [***] proposed price appears to be [***] and Caddell may wish to revise.  Additionally, the [***] total cost is on the [***] end and this is another area that Caddell may wish to revise.

AR 893.  Caddell's price was [***] while the IGE was $186,932,794.  AR 878.  Caddell's General Requirements cost was [***] IGE, and its [***] IGE.  AR 879.  On the basis of this letter, Caddell made several changes to its technical proposal, but did not alter its price, stating:

Caddell has reviewed proposed CLIN 001 cost, specifically as it applies to General Requirements and General and Administrative total cost.  Caddell confirms that the pricing submitted January 13, 2015 remains unchanged.

---

[7]     Mr. Lai identified himself as a Contract Specialist in this document.  AR 1056.

AR 896-98.

Pernix's overall price of [***] was [***] below the IGE of $186,932,794.  AR 878.  In his discussion letter to Pernix, the Contracting Officer mistakenly wrote:

> Pernix's price proposal appears to be [***] in comparison to the Independent Government Estimate (IGE). The proposed [***] cost is [***] and Pernix may wish to revise its proposed costs here.  Additionally, the [***] total cost is on the [***] end and this is another area that Pernix may wish to revise.

AR 895.  This statement was admittedly erroneous as Pernix's price was low, not high – [***] below the IGE.  Compare AR 878 with AR 895; Tr. 78-79.  With respect to General Requirements, Pernix's price was [***] IGE, and Pernix's General Administrative cost of [***] IGE.  AR 879.  The Contracting Officer described Pernix's General and Administrative costs as "on the [***] end" – when in fact they were [***] the IGE, while he described Pernix's General Requirements cost as [***] when it was only [***] than the IGE.  AR 895.  Although Pernix's [***] than the IGE listed [***], DOS in its discussion letter did not mention Pernix's [***] as compared with the IGE.  Id.

In response to the Contracting Officer's erroneous representation, Pernix further reduced its total price from [***] to $155,976,154 [***] 16.6% below the IGE.  AR 915, 945.  In reducing its offer, Pernix stated:

> Pernix has taken this opportunity to thoroughly review our price proposal and [***].  We are very confident of our new price, and have attached to this letter a file with revised pricing for your review.

AR 915.  In CLIN 001, Pernix decreased its price from [***] the IGE, largely by [***] the IGE) and [***] the IGE.  Compare AR 879 with AR 1006.  Pernix then [***] from [***] in its initial offer to [***] in its final offer.  Compare AR 884 with AR 1006.

The following chart reflects Pernix's price revisions to CLIN 001 and Caddell's unchanged pricing of its CLIN 001 costs, as compared to the IGE:

|  | IGE | Pernix (Initial) | Pernix (Revised) | Caddell (Initial and Revised) |
|---|---|---|---|---|
| Total Building and Site Work | [***] | [***] | [***] | [***] |
| General Requirements | [***] | [***] | [***] | [***] |
| Indirects | [***] | [***] | [***] | [***] |
| General and Administrative | [***] | [***] | [***] | [***] |
| Profit | [***] | [***] | [***] | [***] |

| Total Construction Costs | [***] | [***] | [***] | [***] |
|---|---|---|---|---|

Compare AR 1006 with AR 879, 884.

Following receipt of revised proposals, COST reevaluated the price proposals, and the TEP reevaluated the technical proposals. The TEP gave a "fail" to all four offerors for staffing issues. AR 1020, 1022, 1062. On May 13, 2015, COST issued a second price evaluation memorandum to Contracting Officer Lai. AR 1005-19. COST noted Pernix's reduced price, stating:

> All the revised bids have been reduced except for Caddell whose bid remains unchanged. Pernix still remains the lowest bidder. Their bid has decreased an additional [***] to $155 million, and is now [***] 16.6% below the IGE, before it was [***] below the IGE.

AR 1006. COST again raised concerns regarding Pernix's ability to perform the contract, repeating that "[o]ne would question Pernix's ability because they have the [***] throughout their proposal and a [***] profit margin." AR 1007. COST further noted the "wide differences" in the subelement of "Total Building and Site Work" among all bidders. AR 1006.

Based on technical deficiencies in the proposals, Contracting Officer Lai issued a second round of discussion letters on May 21, 2015. DOS' letters to Pernix and Caddell did not raise any pricing issues but solely discussed technical issues. AR 1020-23. Contracting Officer Lai requested revised proposals by May 27, 2015. AR 1021, 1023. Caddell and Pernix both made technical alterations to their proposals. On June 1, 2015, the TEP issued another revised technical evaluation and found that Caddell, Pernix, and BL Harbert met the solicitation requirements, while Framaco did not. AR 1042.

On June 4, 2015, at 10:42 a.m., DOS requested that Pernix verify by 3:00 p.m. that same day that it understood the requirements of the scope of work for the project and that its offered price was what it proposed on May 4, 2015, i.e., $155,976,154. AR 1052. DOS stated:

> This email is to request clarification regarding the revised price proposal that was submitted by Pernix on May 4, 2015. The revised price represents a [***] from your original cost/price proposal submitted on January 13, 2015.

> You are hereby requested to verify, in writing, that Pernix understands the requirements of the Scope of Work for the Maputo New Embassy Compound project, and that your offered price is in the amount that was proposed on May 4, 2015.

Id. Pernix was not notified in this verification request of DOS' earlier errors advising Pernix that its original price was [***] than the IGE, when in fact Pernix's original price was [***] the IGE, or DOS' exaggeration of the General Requirements costs being [***] as opposed to [***] end," or DOS' minimization of the General and Administrative cost discrepancy stating it was "on the [***] end," when it was [***] than the IGE. AR 895, 1052.

In response, Pernix verified its price, stating:

> In response to your request for clarification Pernix hereby confirms it understands the requirements of the Scope of Work for Maputo New Embassy Compound project as revised through Amendment 03, and that our offered price is the amount as proposed on May 4, 2015 [$155,976,154].

AR 1053.

## Award

On June 11, 2015, Contracting Officer Lai[8] and Contracting Officer James G. Thomas, Jr. issued a Price Negotiation Memorandum summarizing the history of the solicitation and discussions, and determining that the contract would be awarded to Pernix as the lowest priced technically acceptable offeror. AR 1059-63. The final prices for all offerors as compared to the IGE were:

| IGE | Pernix | Framaco | Caddell | BL Harbert |
|---|---|---|---|---|
| $186,932,794 | $155,976,154 | [***] | [***] | [***] |

AR 1005.

The Price Negotiation Memorandum did not reflect Contracting Officer Lai's earlier mistaken discussion letter to Pernix. The Contracting Officers also noted that the offerors' proposed prices were evaluated "in accordance with [FAR] 15.404-1(b)(2)(i)" and "that Adequate Price Competition is present and sufficient." AR 1062. Pernix's price was determined to be fair and reasonable. Id.

In their Price Negotiation Memorandum, the Contracting Officers relied on Pernix's price verification when finding that Pernix understood the performance requirements of the RFP:

> [COST] advised that bid verification be obtained and a request for clarification was sent to Pernix on June 4, 2015. In response, the offeror replied that very same day and verified that it understood the requirements of the project and that it confirmed its proposed pricing. The price is believed to be a relatively fair representation of the RFP performance based on comparison to the IGE which was develop[ed] by Government cost estimating professionals referencing the same RFP provided to the offerors.

AR 1063. Contracting Officers Lai and Thomas concluded that "[t]here is sufficient evidence that the offeror understood the performance requirements of the RFP and reflected same in [its] proposed price" of $155,976,154. Id. In reaching this conclusion, the Contracting Officers did not realize that the Government had made a mistake in originally advising Pernix its price was high, as compared to the IGE. Nor did the Contracting Officers know that Pernix, when

---

[8]     Contracting Officer Lai referred to himself as Contract Specialist in this document.

verifying its revised and reduced pricing, was never told that its original price had been low as compared to the IGE, not high.

On June 15, 2015, Contracting Officer Thomas issued a Source Selection Decision Memorandum, which noted that "[t]he analysis of proposed pricing was conducted using the final revised proposals from each offeror to determine which submitted the lowest priced proposal." AR 1065. In the Source Selection Decision, the Contracting Officers included the following chart showing the variance between offerors' final price proposals and the IGE:

| COMPANY | TOTAL PRICE | VARIANCE FROM IGE |
|---------|-------------|-------------------|
| BL Harbert | [***] | [***] |
| Caddell | [***] | [***] |
| Framaco | [***] | [***] |
| Pernix | $155,976,154 | -16.6% |
| IGE | $186,932,794 | |

AR 1066-67. Contracting Officer Thomas conducted an independent analysis of the information provided and set forth his comparison of the offerors' technical ability and price. For Caddell, he stated:

> The price proposal submitted by Caddell was evaluated as the second highest priced proposal. Caddell's technical proposal was rated "pass." Caddell's proposal offers a good proposal compared to that of all submitted proposals. Although award to Caddell presents no significant weaknesses and numerous valuable strengths, it come[s] at a [***] than the IGE, and since this is a lowest priced technically acceptable acquisition, the award will not be made to Caddell.

AR 1067.

With respect to Pernix, Contracting Officer Thomas stated:

> The price proposal submitted by Pernix was the lowest priced proposal. Pernix's volume two proposal was rated "pass." Award to this offer[or] represents the best option in this acquisition as the company submitted the lowest priced technically acceptable offer. It is to be noted that the TEP found Pernix's technical proposal to be the best written one, demonstrating a good understanding of the project requirements and proposing the best method for handling the construction job.

Id.[9]  Contracting Officer Thomas, however, made no mention of Pernix's price proposal as compared to the IGE in his assessment.  Id.

Contracting Officer Thomas further stated that Pernix showed "a proven positive record of past performance and specialized experience with an approach that demonstrated a comprehensive grasp of the scope of work."  AR 1068.  In the Contracting Officer's view, Pernix "provided a proposal that generated a fair and reasonable offer to the Government and yielded the greatest level of confidence that successful performance for the work on the Maputo [New Embassy Compound] will be realized."  Id.

Contracting Officer Thomas found that adequate price competition established price reasonableness and that each offeror was a responsible company before selecting Pernix for award.  AR 1067-69.  According to the Source Selection Decision Memorandum, however, Contracting Officer Thomas did not review the discussion letters and responses generated among DOS and the offerors during his independent analysis.  He wrote:

> I performed an independent analysis of the information provided in order to accomplish an integrated assessment of the TEP's findings.  The independent analysis included reviewing the Technical Evaluation Panel Evaluation reports dated February 6, 2015; May 14, 2015; and June 1, 2015; Price Proposal[] Analyses dated February 2, 2015 and May 13, 2015; the RFP; and where necessary, the offerors' proposals.

AR 1066.  As such, the Contracting Officer made award without knowing that Pernix had been erroneously advised that its price was [***] than the IGE when in fact it was [***] below the IGE – misinformation that may have caused the awardee to further reduce its price.

## Procedural History

Caddell and Pernix were notified of the award to Pernix on June 17, 2015.  AR 1072, 1074.  In its notification letter to Caddell, DOS released the final contract award amount of $155,976,154, but not the IGE.  AR 1074.  Caddell's bid protest in this Court followed on June 22, 2015.  The Court publicly issued its original opinion on October 2, 2015, and the parties further developed the record on the pricing issue presently before the Court.  The Government voluntarily stayed performance until January 29, 2016.

During the course of the proceedings before this Court, the Government filed the Administrative Record under seal on July 7, 2015.  Caddell filed its initial Motion for Judgment

---

[9]      For [***], Contracting Officer Thomas wrote:

The price proposal submitted by [***] was evaluated as the highest priced proposal.  [***] technical proposal was rated "pass."  [***] volume two proposal offers a technically acceptable proposal, but at a premium that is over the acceptable range per PDCS/COST.

AR 1067.

on the Administrative Record ("MJAR") on July 21, 2015, and a redacted version on August 6, 2015.  In its redacted MJAR, Caddell publicly released the IGE.  See Pl.'s Redacted Mot. 21.

Defendant and Intervenor at no point released the IGE, nor did they release any indication of the percentage differences between offerors' prices and the IGE.  See, e.g, Def.'s Mot. 25; Intervenor's Mot. 45-47.  In its supplemental briefing filed after its MJAR, Caddell did not disclose the IGE publicly, and noted that "[n]either the total IGE nor the IGEs for sub-components of work were disclosed to offerors or the public."  Pl.'s Suppl. Br. 3.  In this supplemental briefing, Caddell redacted the IGE as well as all percentage comparisons of offerors' pricing with the IGE.  Pl.'s Redacted Suppl. Br. 3, 4-5, 14-26.  In Defendant's supplemental briefing, Defendant stated that Caddell had released the IGE in the redacted version of its MJAR and relied upon this disclosure in arguing against injunctive relief "because Pernix's final price of $155,065,084 is now public knowledge, as is the IGE." Def.'s Suppl. Br. 15 (citing Pl.'s Redacted Mot. 21, 33)).[10]

## Discussion

## Jurisdiction and Standard of Review

This Court has jurisdiction over the instant bid protest under 28 U.S.C. § 1491(b).  The Court evaluates bid protests in accordance with the Administrative Procedure Act's standard of review for agency action.  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Under Rule 52.1 of the Rules of the Court of Federal Claims, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record.  See id. at 1356.  Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record.  Id. at 1355.

This Court will set aside an agency's procurement decision if the agency abused its discretion or acted arbitrarily, capriciously, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A) (2012); Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014); Ala. Aircraft Indus., Inc. – Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009).  In order to obtain relief, if this Court finds that the agency's actions were contrary to law or regulation, the Plaintiff must also show that the violation was prejudicial.  Bannum, 404 F.3d at 1351.

## Caddell has Standing to Pursue this Protest

To establish standing to bring a bid protest under 28 U.S.C. § 1491(b), a plaintiff must demonstrate that it is an "interested party" as defined under the Competition in Contracting Act, 31 U.S.C. § 3551 ("CICA").  Am. Fed'n of Gov't Emps. AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("AFGE") (holding that bid protesters seeking relief under 28 U.S.C. § 1491 must meet the standing definition of "interested party" under CICA).  Under CICA the term "interested party,"

---

[10]   During oral argument, the Court stated, "[Pernix] does not and cannot know that it was misled," and counsel for Intervenor responded that Pernix "does not know, and it would not be told.  They don't know anything about that."  Tr. 113.

(A) with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.

31 U.S.C. § 3551(2)(A) (2012).

In Information Technology & Applications Corp. v. United States ("ITAC"), the Federal Circuit explained:

In order to establish standing, ITAC [the protester] must show that it is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract, i.e., that ITAC was an interested party, prejudiced by the award to RSIS.

316 F.3d 1312, 1319 (Fed. Cir. 2003) (internal citations, alteration, and quotation marks omitted); AFGE, 258 F.3d at 1302. The Federal Circuit has interpreted the prejudice component of demonstrating a "direct economic interest" to mean that a protester would have a "substantial chance" of receiving the contract award – i.e., "that it could compete for the contract if the bid process were made competitive." See Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In arguing that it has standing, Caddell invokes Scanwell Laboratories, Inc. v. Schaffer, 424 F.2d 859, 864 (D.C. Cir. 1970), the seminal case on bid protest jurisdiction in the District Courts under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). Relying on Scanwell, Plaintiff posits that "[d]isappointed bidders act in a manner akin to a 'private attorney general' in bringing forth bid protests to vindicate these public harms." Pl.'s Suppl. Br. 8. Caddell cites the public harm of condoning misleading discussions and undermining the award in violation of the basic tenets of fairness and integrity in the procurement process. Id. While Scanwell suits were brought under the APA's standing requirements and did not require a protester to demonstrate a particularized injury to establish standing, the standing requirement for bid protests in this Court – that a plaintiff be an interested party – is markedly different, and does require that a protestor show it would have a substantial chance of receiving award absent the procurement error.[11]

---

[11]    Given that the Administrative Dispute Resolution Act ("ADRA"), 28 U.S.C. 1491(b), is silent on the standing requirements for a bid protest in this Court, courts interpreting ADRA could have chosen to import this straightforward private attorney-general standing requirement applied in Scanwell and other APA actions, but they did not – instead applying CICA's "interested party" definition previously used in now repealed Brooks Act protests at the General Services Administration Board and currently used at the GAO. E.g., Am. Fed'n of Gov't Emps. AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Consistent with Plaintiff's argument, the adoption of a private attorney-general standing requirement would comport with the application of the APA standard of review required by ADRA, 28 U.S.C. § 1491(b)(4), and would have the salutary effect of reducing the frequent, often complex, threshold challenges to standing in these expedited bid protests. See Frederick W. Claybrook Jr., Standing, Prejudice, and Prejudging in Bid Protest Cases, 33 Pub. Cont. L. J. 535, 539-40 (Spring 2004). However,

Caddell argues that it has standing because it was the "offeror next in line for award," and that had Pernix's proposal been eliminated for its lack of price reasonableness, Caddell could have received the award.  Pl.'s Mot. 2, 24-27.[12]  DOS counters that Caddell lacks standing because it failed to demonstrate prejudice in that Caddell did not change its price despite having been accurately notified that its price was higher than the IGE.  DOS and Pernix further argue that even if Pernix would have raised its price had DOS not mislead Pernix, it "belies believability" that Pernix would have revised its price upward by more than [***] so as to overcome the price differential between Pernix's initial offer price of [***] and Caddell's initial offer price of [***].  Def.'s Suppl. Br. 5; Intervenor's Suppl. Br. 26-30.

To establish standing, Caddell need only show that "it would have been a qualified bidder" in a competitive procurement, had the procurement error not occurred – it does not "need to show that it would have received the award in competition with other hypothetical bidders . . . ."  Myers, 275 F.3d at 1370-71.  Essentially, Defendant and Intervenor argue that, given its pricing thus far in the procurement, there is no way that Caddell could be the lowest priced offeror in another price evaluation.  This argument, however, takes the Court too far down the path of a merits assessment in ruling on a threshold issue.  As the Court in Textron Inc. v. United States recognized, addressing questions of standing that presuppose a discussion of the merits would "lead the court in a round-robin through the arguments on the merits in order to resolve a jurisdictional issue.  Such is not a desirable or appropriate procedure."  74 Fed. Cl. 277, 284-85 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Tech. Servs., Inc., 222 F. App'x. 996 (Fed. Cir. 2007), and dismissed per stipulation, 223 F. App'x. 974 (Fed. Cir. 2007).  In assessing standing, the Court should look to Plaintiff's allegations, ITAC, 316 F.3d at 1319, not prejudge the merits of a bid protest.  Moreover, the prejudgment that DOS and Intervenor invite would entail guessing what Pernix would bid and what the Agency would decide.  It is unknown what price Pernix may offer given accurate information.  This Court should not deny a plaintiff access to the courthouse or bar a plaintiff from presenting a claim based upon the speculative construct that the plaintiff cannot ultimately win.  This is especially compelling in a situation such as this where Defendant and Intervenor seek to bar Plaintiff from bringing a claim of an egregious pricing misevaluation on the ground that Plaintiff could not have won the award based upon pricing.

---

unless the Federal Circuit alters the legal standard for assessing bid-protest standing, the interested party test is controlling, not the private attorney general theory pressed by Plaintiff.

[12]     In another vein, Caddell argues that had Pernix been provided with accurate information, Pernix may have adjusted its price upward, and had Caddell been provided with similarly misleading information, it would have lowered its price.  Pl.'s Suppl. Br. 16.  DOS and Pernix argue that Caddell waived any argument that Caddell would have adjusted its price downward if given similarly misleading information as Pernix, relying on Qwest Government Services, Inc. v. United States, 112 Fed. Cl. 24, 36 (2013).  Def.'s Suppl. Br. 6 n.5; Intervenor's Suppl. Br. 17-18.  Qwest does state that a plaintiff in a bid protest must "raise all of its challenges in its opening brief" or those arguments are waived.  112 Fed. Cl. at 36.  Given the fact that this is a trial-level proceeding where the record and arguments can be further developed, this Court declines to follow Qwest, and finds that Plaintiff did not waive this argument.  The Court nonetheless rejects the argument as speculative.

Indeed, Caddell alleged that Pernix's proposal should have been rejected outright for an unreasonable price, thus paving the way for award to Caddell. Pl.'s Mot. 27 ("Had the price evaluation been properly conducted, it is clear that Pernix's price would be deemed unreasonably low, leaving Caddell as the lowest price technically acceptable offeror."). Although the Court did not ultimately conclude that Pernix's proposal should have been definitively rejected as noncompliant with the price reasonableness requirement, thus eliminating Pernix from the competition, Plaintiff's allegations were plausible and if successful, would have enabled Plaintiff to secure the award. [13] Caddell submitted a proposal and is a qualified offeror determined to be technically acceptable and ranked just below Pernix. Plaintiff alleged serious procurement errors – misleading unequal discussions that resulted in an invalid award at a price obtained essentially under false pretenses. Pl.'s Mot. 22-24, 27; Pl.'s Suppl. Br. 1. The circumstances here persuade the Court that Caddell had the requisite direct economic interest in award to pursue this protest. See ITAC, 316 F.3d at 1319 (finding protester established standing because the protester's proposal met the minimum contract requirements and, were the award to be set aside for failure to conduct meaningful discussions, the protester might secure it); Impresa, 238 F.3d at 1334 (finding a protester had standing because the protester could compete for award if the agency were obligated to rebid the contract); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1360 (Fed. Cir. 2015) (same).

### The Court Has Subject-Matter Jurisdiction Over the Instant Protest

Defendant makes a second threshold argument that this Court lacks jurisdiction to hear the instant protest because it is a claim for reformation. DOS contends that once a contract award has been made, any potential reformation claims over pricing errors in the contract between Pernix and the Government fall under the Contracts Disputes Act ("CDA") and are beyond the Court's subject-matter jurisdiction in a bid protest. Def.'s Suppl. Br. 9. In so arguing, Defendant seeks to recast what is a post-award bid protest, where an offeror seeks injunctive relief, as a performance dispute where a contractor's former competitor – a nonparty to the contract – would be seeking reformation of another entity's contract pricing. Plaintiff as a disappointed bidder challenging an award has not sought what would be a bizarre remedy of reforming the awardee's contract price. Rather, Plaintiff asks that the Court enjoin an illegal contract award and reopen the competition. This is a classic bid protest, not a CDA claim for reformation.

### DOS Failed to Conduct Meaningful Discussions with Pernix, Tainting Its Price Evaluation and Creating an Uneven Playing Field

Caddell argues that the Agency misled Pernix by telling Pernix its price was [***] than the IGE when it was [***] below the IGE, and that if Pernix had been given accurate information, it would have raised its price. Pl.'s Suppl. Br. 14-16. DOS admits that it mistakenly informed Pernix that its initial price was [***] than the IGE when it was actually [***] below the IGE. Tr. 79 ("[I]t was not any intention to mislead on the part of Department of State . . . . They acknowledge that this was an error."). In its first discussion letter to Pernix, DOS wrote:

---

[13]    Plaintiff also alleged that Pernix should have been deemed nonresponsible, but the Court does not find this allegation plausible based upon the facts alleged. Pl.'s Suppl. Br. 25.

> Pernix's price proposal appears to be [***] in comparison to the Independent Government Estimate (IGE). The proposed General Requirements cost is [***] and Pernix may wish to revise its proposal costs here. Additionally, the General and Administrative total cost is on the [***] end and this is another area that Pernix may wish to revise.

AR 895 (emphasis added).[14]

This discussion not only misled Pernix to believe that its overall offer price was [***] compared to the IGE, but also improperly told Pernix that its General Requirements amount was [***] – when it was only [***] above the IGE – and that its General and Administrative cost was "on the [***] end" – when it was [***] the IGE. AR 879. After receiving DOS' misleading statement, Pernix further lowered its price to [***] below the IGE. AR 915, 945. Pernix's price reduction included lowering its CLIN 001 General Requirements cost to [***] the IGE, and its General and Administrative cost to a lesser amount [***] the IGE, but still a significant deviation of [***] the IGE. Compare AR 879, 884 with AR 1006.

While an agency has considerable discretion in conducting discussions with offerors, that discretion is not a license to mislead an offeror. Gentex Corp. v. United States, 58 Fed. Cl. 634, 653 (2003). FAR 15.306(d) outlines the obligation of an agency to conduct meaningful discussions with offerors in negotiated procurements:

> (3) At a minimum the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.

48 C.F.R. § 15.306(d)(3) (2014) (emphasis added). As such, when discussions occur, the contracting officer must accurately identify weaknesses. An error in communicating a weakness that causes an offeror to revise its proposal is quintessentially a misleading discussion. See AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 369 (2009) (finding the agency's failure to communicate a proposal weakness to a protester by giving that type of guidance to other offerors, was arbitrary and capricious agency action). The Court recognizes that DOS awarded the contract to Pernix without realizing Pernix's revised pricing had resulted from misleading discussions. However, inadvertency is irrelevant in assessing whether discussions were misleading. Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 48 (1997) ("'An agency may not inadvertently mislead an offeror, through the framing of a discussion question, into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies; or the government's requirements.'") (quoting SRS Techs., 1994 WL 576118, at *3 (Comp. Gen. 1994)).

---

[14]     As Defendant acknowledges, this error appeared to have been a clerical error – with DOS repeating verbatim the information in Caddell's discussion letter in its letter to Pernix. Tr. 79 ("What happened is that they had sent out letters to all of the offerors who were still in the game at this point, and if you look, they sent out a very similar letter to Caddell where they actually said the price is [***] in relation to the IGE, and it was just an oversight, a typographical error . . . .").

The agency unlawfully misled Pernix into lowering its price in violation of FAR 15.306(d) by advising Pernix its price was [***] than the IGE, when its price was lower.  This error took on enhanced significance in a procurement where the Agency, without realizing its error, had articulated concerns about whether Pernix could perform at such a low price.  On several occasions during the evaluation the price evaluation team, COST, as well as the Contracting Officers, unequivocally stated that they did "not recommend award to Pernix" because its price was too low – both before Pernix lowered its price in response to erroneous discussions and after.  The record reflects the Agency's concern no less than six times:

- COST's initial assessment questioned Pernix's ability to perform the contract at its initial offer price "because they have the [***] throughout their proposal and a [***] profit margin."  AR 879.

- COST explicitly did not recommend award to Pernix without a price verification.  AR 882.

- COST's second price analysis questioned Pernix's ability to perform the contract.  AR 1007.

- COST repeated its recommendation not to award Pernix the contract award.  AR 1010.

- Contracting Officer Lai in the Competitive Range Determination memorandum recognized that COST did not recommend award to Pernix and that only Caddell and Framaco priced their offers within the acceptable range of [***] of the IGE.  AR 1055.

- Contracting Officers Thomas and Lai noted in the responsibility determination that only Caddell and Framaco submitted offers that were priced in the acceptable range.  AR 1057.

These misleading discussions had a cascading effect in this procurement, causing the awardee to unwittingly base its pricing on false information and the ensuing price evaluation to be a sham.  Agencies involved in procuring contracts must "[c]onduct business with integrity, fairness, and openness . . . ."  48 C.F.R. § 1.102(b)(3).  This provision of the FAR gives rise to "mandatory duties that constrain the Government's discretion in dealing with bidders."  FFTF Restoration Co., LLC v. United States, 86 Fed. Cl. 226, 239 (2009).  The misleading discussions, Pernix's resulting misinformed pricing, and the Government's resulting misinformed award, tainted the procurement and removed the requisite integrity, fairness and openness from this procurement.

FAR § 15.306(e)(1)'s prohibition against acquisition personnel engaging in conduct that favors one offeror over another, is also implicated here.  48 C.F.R. § 15.306(e)(1).   As the Federal Circuit in Raytheon Co. v. United States, explained:

That regulation [15.306(e)(1)], in its common-sense meaning in the context of competitive bidding, requires that the agency avoid giving materially disparate

information to bidders on matters that could easily affect their decisions about important aspects of the final competing offers that the agency will be comparing.

809 F.3d 590, 596 (Fed. Cir. 2015) (citing AshBritt, 87 Fed. Cl. at 368-69; Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 633-35 (2002); Dynacs Eng'g Co., Inc. v. United States, 48 Fed. Cl. 124, 133-34 (2000)).  Here, DOS gave Pernix erroneous information not given to other offerors that impacted Pernix's pricing.

**DOS Failed to Properly Evaluate Proposals for Price Reasonableness**

Caddell argues that the Contracting Officer failed to properly evaluate Pernix's price for price reasonableness under FAR 15.404-1 based on DOS' erroneous discussion letter and inadequate price verification.  Pl.'s Mot. 20-26; Pl.'s Reply 26-27.[15]  DOS counters that "DOS [was not] required to conduct an analysis as to whether Pernix's price was unreasonably low because the procurement was a fixed-price one."  Def.'s Suppl. Br. 6 n.6; Def.'s Mot. 23-24. Defendant contends that an analysis of whether an offer price is unreasonably low falls within the scope of price realism not price reasonableness and that assessing whether Pernix's price was unreasonably low is not required in a firm fixed-price contract, as this type of contract is designed to place the risk of an unreasonably low bid on the offerors.  Def.'s Mot. 23 (citing NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015)).  NVE, Inc., states:

> Where an award of a fixed-price contract is contemplated, a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk of loss on the contractor.  Thus, for a price realism analysis to apply in a fixed-price contract, the solicitation must expressly or implicitly require a price realism analysis for a proposal to be rejected for an unrealistically low price.

121 Fed. Cl. at 180 (internal citations omitted).  Here, although the solicitation did not require a price realism analysis, the solicitation did mandate that proposals be analyzed to ensure that a final offer price was "fair and reasonable" under FAR 15.404-1.  Defendant violated this procedural requirement here.

The solicitation required the Agency to evaluate proposals on the basis of price reasonableness in accordance with FAR 15.404-1.  AR 239.  FAR 15.404-1's stated objective "is to ensure that the final agreed-to price is fair and reasonable."  The responsibility to determine price reasonableness falls on the contracting officer.  FAR 15.404-1(a)(1) provides:

> The contracting officer is responsible for evaluating the reasonableness of the offered prices.  The analytical techniques and procedures described in this section may be used, singly or in combination with others, to ensure that the final price is fair and reasonable.

---

[15]    Caddell hints that the Agency's evaluation also revealed unbalanced pricing, stating "COST also engaged in significant analysis of how elements of each offeror's proposal compared to other elements of that same offeror's proposal, essentially discerning instances of potentially unbalanced bids."  Pl.'s Suppl. Br. 4.  As Caddell has not identified sufficient facts supporting this insinuation, the Court summarily rejects any claim of unbalanced bidding.

48 C.F.R. § 15.404-1(a)(1) (2015). FAR 15.404-1(b)(2)(i) elaborates on appropriate price analysis techniques:

> (b)(2) The Government may use various price analysis techniques and procedures to ensure fair and reasonable price. Examples of such techniques include, but are not limited to, the following:
>
> (i) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes a fair and reasonable price. (see 15.403-1(c)(1)(i) [requirements for adequate price competition]).
>
> * * *
> (v) Comparison of proposed prices with independent Government cost estimates.

Id. at § 15.404-1(b)(2)(i), (v).

Here, Contracting Officer Thomas attempted to employ "adequate price competition" as his technique for determining the reasonableness of the offerors' proposed prices under FAR 15-404-1(b)(2)(1). AR 1062.[16] He stated:

> The proposed prices were evaluated in accordance with FAR 15.404-1(b)(2)(1). Because all offers were submitted to meet the same requirement within the time frame allowed by the RFP, I determined that Adequate Price Competition is present and sufficient.

Id.  However, unbeknownst to the Contracting Officer, all offers had not been submitted to "meet the same requirement" as one offer -- the successful offer -- was based upon wrong information about its comparison to the IGE.  This information was different information than that conveyed to other offerors, leading to a misunderstanding about what that so-called "same requirement" for competitive pricing was.  In short, a misinformed price cannot be properly used as a benchmark for achieving adequate price competition.

The general requirements for "adequate price competition" are set forth in FAR 15.403-1(c)(1)(i):

> Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement and if
>
> (A) Award will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection; and

---

[16]     The Contracting Officers did not articulate that they had applied any other price analysis technique under FAR 15.404-1(b)(2), including comparing the proposed prices to the IGE, but in discussion letters DOS had informed offerors where their pricing stood vis-à-vis the IGE.  In the Source Selection Decision Memorandum the Contracting Officer referenced that Caddell's proposed price was [***] the IGE, and included a chart comparing all offerors' proposed prices to the IGE.  AR 1066-67.

(B) There is no finding that the price of the otherwise successful offeror is unreasonable.  Any finding that the price is unreasonable must be supported by a statement of the facts and approved at a level above the contracting officer.

48 C.F.R. § 15.403-1(c)(1)(i) (2015).

The "technique" of misinforming an offeror that its price was high when in fact its price was low, and concomitantly misguiding that offeror about how "high" certain subelements were, is not a "price analysis technique or procedure" that meets the fundamental purpose of the FAR to ensure the "final price is fair and reasonable."  FAR 15.404-1(a)(1).  Because the awardee's price resulting from the erroneous discussion letter was not based upon reality or the offeror's accurate understanding of its pricing status vis-à-vis the IGE, that price cannot be said to be "fair" or "reasonable."  Nor can such a price form the basis of an "adequate price competition" within the meaning of FAR 15.404-1, as one offeror's price was influenced by erroneous, misleading discussions that were never corrected.  As such, Plaintiff has established that the Agency violated the procedure in the FAR for assessing price reasonableness.[17]

### DOS' Price Verification was Inadequate and Did Not Cure the Misleading Discussions

Caddell argues that DOS exacerbated its initial error by seeking only verification that Pernix's final proposed price was correct without informing Pernix that its initial price had been [***] below the IGE, rather than [***] than the IGE.  Pl.'s Suppl. Br. 17, 23; Pl.'s Resp. 27-28.  Defendant and Intervenor counter that Pernix's price verification adequately demonstrated Pernix's ability to perform the contract at the reduced price of $155,976,154, and was sufficiently explained as [***].  AR 915; Def.'s Mot. 24; Intervenor's Suppl. Br. 20-21.

The duty to verify price is set forth in Part 14 of the FAR that governs sealed biding, not in Part 15 that governs negotiated procurements.  48 C.F.R. § 14.407-3(g).  However, the Court has repeatedly applied the price verification requirement to negotiated procurements.  See, e.g., PHT Supply Corp. v. United States, 71 Fed Cl. 1, 21 (2006) ("Although the duty to raise mistakes in an offeror's proposal is no longer set forth explicitly in the regulations governing negotiated procurements, that duty undoubtedly still exists."); Griffy's Landscape Maint. LLC v. United States, 46 Fed. Cl. 257, 259 (2000) (holding that the duty to verify price extends to negotiated procurements).

FAR 14.403-7(g) provides in pertinent part:

(g) Suspected or alleged mistakes in bids shall be processed as follows.  A mere statement by the administrative officials that they are satisfied that an error was made is insufficient.

(1) The contracting officer shall immediately request the bidder to verify the bid.  Action taken to verify bids must be sufficient to reasonably assure the contracting officer that the bid as confirmed is without error, or to

---

[17]     This is a process violation.  This Court does not find that Pernix's price was unreasonable.  Rather, the Court finds that under the circumstances, neither the Government nor Pernix could or did accurately ascertain whether Pernix's price met the requirement for a fair and reasonable price in FAR 15.404-1.

elicit the allegation of a mistake by the bidder.  To assure that the bidder will be put on notice of a mistake suspected by the contracting officer, the bidder should be advised as appropriate –

> (i) That its bid is much lower than the other bids or the Government's estimate as to indicate a possibility of error

* * *

48 C.F.R. § 14.407-3(g).

A verification request must inform the offeror of all factors that indicate that an error might have been made.  Id.; United States v. Metro Novelty Mfg. Co., 125 F. Supp. 713, 714 (S.D.N.Y. 1954).  If the Government fails to disclose a "pertinent factor" to a bidder, the price verification is rendered inadequate.  United States v. Hamilton Enters., Inc., 711 F.2d 1038, 1045-46 (Fed. Cir. 1983) (finding a price verification inadequate when the Government failed to put the offeror on notice of the 69% price disparity between its proposal and the Government estimate).  When asking Pernix to verify its price, DOS failed to disclose a pertinent factor in that it did not notify Pernix of the agency's prior error – thus continuing to mislead Pernix to believe that its original price had been higher than the IGE.  Instead, DOS only asked Pernix to verify its further price reduction from [***] below the IGE to 16.6% below the IGE, stating that Pernix's "revised price represents a [***] reduction from your original cost/price proposal submitted on January 13, 2015."  AR 1052.

This communication perpetuated the agency's original error.  Pernix's price was originally [***]below the IGE, and after the misleading discussions, its price was 16.6% below the IGE.  AR 1006.  However, the Contracting Officer never advised Pernix either of this disparity between its revised price and the IGE or of its original misleading discussion that prompted Pernix to reduce its price.  Because the awardee was never told where its original or revised pricing accurately stood vis-à-vis the IGE, the so-called verification did not put Pernix on notice of the nature and extent of the suspected mistake or give the offeror the opportunity to meaningfully verify its pricing, as required by FAR 14.407-3.  Hamilton Enters., Inc., 711 F.2d at 1046.

**DOS' Error Prejudiced the Protester and All Offerors and Undermined the Integrity of the Procurement Process**

Although they acknowledge DOS erred in discussions with the awardee, Defendant and Intervenor contend the award should not be disturbed because Plaintiff has failed to show that it would have a substantial chance of receiving award because Caddell's initial price proposal was [***] higher than Pernix's initial price.  Defendant focuses on prejudice in arguing lack of standing, whereas Intervenor argues that Plaintiff failed to establish prejudice on the merits, asserting that the Agency's discussion letter was a de minimus error and immaterial to the award.  Def.'s Suppl. Br. 4; Intervenor's Suppl. Br. 23. [18]   In so arguing, Intervenor has failed to

---

[18]   Defendant does not argue that Caddell was required to establish prejudice to prevail on the merits of its protest in its supplemental briefing, but pointed out in its initial Motion that under the APA, harmless errors are not prejudicial to a protester.  Def.'s Mot. 25.

appreciate the gravity and reach of the procurement error, and has imposed a far more onerous burden to demonstrate merits prejudice than that required by law.

This Court assesses prejudice under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as mandated under the Administrative Dispute Resolution Act of 1996 ("ADRA"), 28 U.S.C. § 1491(b) (2012).  ADRA provides:

> (4) in any [bid protest] action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5 [the Administrative Procedure Act].

28 U.S.C. § 1491(b).  5 U.S.C. § 706(2)(A) states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall –
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be-
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> * * *

In making the foregoing determinations, the Court "shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." Id.  Where, as here, *"the trial court finds that the government's conduct fails APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."* Bannum, 404 F.3d at 1351.  This prejudice inquiry on the merits is distinct from the jurisdictional inquiry regarding standing.  The Court assesses "prejudice" twice in bid protests – once in the standing analysis and again in the review of the merits.  For purposes of determining standing, the "prejudice" inquiry is part and parcel of whether a protester is an "interested party" as defined by the Competition in Contracting Act ("CICA").  See AFGE, 258 F.3d at 1302.  In contrast to this threshold interested-party standing analysis, the merits analysis dictated by ADRA's mandate importing the APA standard of review, focuses on whether an established procurement violation is sufficiently "prejudicial" to be worthy of relief.

As the APA instructs, in determining whether to set aside agency action, the Court shall take "due account . . . of the rule of prejudicial error."  5 U.S.C. § 706.  In the seminal case of Kentron Hawaii, Ltd. v. Warner, which harkens from the days when post-award bid protests were "Scanwell"[19] cases heard in district courts under the APA, the United States Court of Appeals for the District of Columbia Circuit emphasized that to be remediable, a procedural

---

[19]      Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970).

procurement error had to result in a "prejudicial violation of applicable statute or regulations," or an irrational award decision. 480 F.2d 1166, 1169 (D.C. Cir. 1973). Thus, when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice. See generally Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (recognizing that "a reviewing court may set aside a procurement action if the procurement official's decision lacked a rational basis or for a challenge involving "a violation of regulation or procedure . . . the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.") (emphasis added) (internal citations omitted); Banknote Corp. of Am. Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (recognizing that under the APA standard applied in ADRA cases "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure . . . . When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.") (emphasis added) (internal citation and quotation marks omitted).[20]

As the Court in Textron, Inc. v. United States explained, in a bid protest under the APA prejudice is presumed when the Government acts irrationally. 74 Fed. Cl. at 329. In Textron, the Court differentiated the burden of showing prejudice stemming from arbitrary and capricious agency action versus prejudice stemming from violations of procurement regulations. As the Textron Court explained:

> When the court finds a violation of an applicable procurement regulation the court should determine . . . whether the procurement violation was significant to the protester's chance of being awarded the contract. This prejudice analysis, however, should only be reached when the protester has shown violation of an applicable procurement regulation. If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding. There should be no need to continue to prejudice, because a finding that the Government has acted arbitrarily and capriciously necessarily invalidates the procurement, and the court must enjoin the procurement award or enjoin performance under an award already made . . . .

Id. (emphasis added). Here, the Agency acted arbitrarily and capriciously in misleading Pernix about its pricing and awarding the contract based on misinformed pricing – the award price was based upon error, not a legitimate process, rendering award invalid. In this Court's view, given the nature of this error, prejudice should be presumed.

---

[20]    The Federal Circuit's recent decision in Raytheon Co. v. United States does not alter this result. 809 F.3d 590, 597 (2015). While the Federal Circuit in Raytheon recognized the "substantial chance" test for merits prejudice, it did so in the context of reviewing whether GAO had properly taken prejudice into account in an outcome-prediction, not in an adjudication of a bid protest by the Court of Federal Claims assessing prejudice under ADRA. GAO's bid protest regime is not governed by ADRA, or the APA standard for assessing prejudice. 31 U.S.C. § 3551 (2012).

In the alternative, even if prejudice is not presumed, Plaintiff has nonetheless demonstrated prejudice stemming from the Agency's irrational conduct of this procurement and DOS' violations of procurement regulations. With respect to the Agency's irrational and arbitrary and capricious conduct, the entirety of DOS' pricing evaluation was tainted by its misleading discussions and subsequent inadequate price verification that resulted in an invalid award to Pernix. This Court cannot ignore the systemic prejudice here and speculate on what might have happened to Pernix's price had proper discussions, price evaluation, and a fair competition occurred. As stated in AshBritt,

> The nature of this procurement and sum total of these procurement errors do not lend themselves to a prejudice assessment based only upon assumed pricing corrections woodenly applied – using faulty bids resulting from faulty discussions – to predict what offerors might propose after proper discussions, or which offerors might succeed in a reprocurement – or even to engage in the more modest speculation that AshBritt would be a sure bet loser.

87 Fed. Cl. at 378. Therefore, although it is uncertain what Pernix may have done if given accurate information, "the standard for prejudice adopted by the Federal Circuit and this court does not require such certainty." Overstreet Elec. Co., Inc. v. United States, 47 Fed. Cl. 728, 743 (2000).

Plaintiff has established that DOS violated FAR 1.102 requiring the Agency to conduct procurements with integrity, FAR 15.306 prohibiting the Agency from misleading offerors, FAR 14.403 requiring the Agency to conduct adequate price verifications, and FAR 15.404-1 requiring the Agency to properly evaluate offerors' price proposals for price reasonableness. To demonstrate that these violations of regulation were prejudicial, Plaintiff only had to show that the Agency's procurement error "at least potentially affected the substantive result" of a procedural irregularity in the procurement process. Kentron Hawaii, 480 F.2d at 1181. Here, Plaintiff demonstrated that DOS' error "at least potentially affected the substantive result" because award was made to an invalid price proposal. Id. The crux of the inquiry on whether violation of statute or regulation was prejudicial should be focused on the magnitude and materiality of error to the procurement at hand – not on the plaintiff's chances for securing award. See Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth., 977 F.2d 1472, 1478-79 (D.C. Cir. 1992) ("Nor may courts set aside a procurement decision on the ground that the procuring agency potentially or actually violated applicable law in some trivial way – the violation must have been clear and prejudicial.") (emphasis in original). As is the case in traditional APA review cases, administrative procurement decisions can only be set aside for "substantial procedural or substantive reasons." Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 558 (1978).

An analysis of the standard for demonstrating prejudice on the merits in a COFC bid protest is also informed by the available relief spelled out in ADRA. The remedies authorized by ADRA – injunctive and declaratory relief, and bid and proposal preparation costs – carry with them a burden of proving that the arbitrary and capricious conduct or the procurement illegality "prejudiced" the plaintiff. In the most egregious cases where injunctive relief is warranted, a plaintiff must show irreparable harm to itself to secure such relief and also demonstrate that any harm to third parties and the public interest do not outweigh the harm to plaintiff. Similarly, in

order to secure declaratory relief, a plaintiff must demonstrate a material procurement error that so tainted the process, vacatur of the award would be warranted.  These are clearly "prejudice" type inquiries to be made in the context of fashioning relief.

In a similar vein, to recover its bid and proposal costs – essentially reliance damages – a plaintiff must show that it wasted its costs because the Government breached its obligation to consider the plaintiff's proposal fairly, thus implicating the harm or prejudice caused by such a wasteful loss of effort and expense.  See, e.g., 28 U.S.C. § 1491(b)(2) (2012); Gentex Corp., 58 Fed. Cl. at 656.  For this Court to impose an additional showing of particularized injury in fact – that Plaintiff must show it would have lowered its price to win the procurement in order to attain relief – would be overkill, and an improper conflation of the prejudice required to show standing as distinguished from the prejudice required to show a procurement violation worthy of a particular form of relief.  See Textron, Inc., 74 Fed. Cl. at 284-85.

DOS and Intervenor rely on Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) for the proposition that the price differential between Pernix and Caddell obviates Caddell's claim of merits prejudice.  Def.'s Suppl. Br. 3; Intervenor's Suppl. Br. 26.  Data General was a Brooks Act protest decided by the General Services Administration Board of Contract Appeals under de novo review, not a protest in this Court under ADRA, and thus did not implicate a prejudice analysis required to be done under the APA.  As such, in this Court's view, Data General has no applicability here.

In any event, in a subsequent Brooks Act protest, the Federal Circuit clarified that a price differential alone is not dispositive of prejudice.  Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1368 (Fed. Cir. 2004); see also AshBritt, 87 Fed. Cl. at 376-77.  In Alfa Laval, the Federal Circuit held that a protester was prejudiced by an erroneous award decision, even though its proposal was priced 29% higher than the awardee's technically noncompliant offer. 175 F.3d at 1368.  The Federal Circuit reasoned that, had the procurement been executed properly, the awardee's technically deficient proposal would have been rejected outright, giving the plaintiff a substantial chance of award.  Thus, in Alfa Laval the protester was deemed to be prejudiced even though its price was 29% higher.  Alfa Laval, 175 F.3d at 1368.  As such, even if the Brooks Act prejudice analysis is applied here, this case is more like Alfa Laval because Caddell made a plausible claim that Pernix's proposal should have been rejected outright for lack of price reasonableness.

## DOS Conducted a Proper Responsibility Determination

Caddell additionally argues that DOS erred by not considering Pernix's performance risk in its responsibility determination.  Pl.'s Suppl. Br. 25.  Caddell claims that the information available to the agency in the record suggests that Pernix was incapable of performing the contract requirements, and any prior finding of responsibility was negated by the flawed price verification.  Id. at 25-26.

An Agency exercises broad discretion in conducting responsibility determinations under FAR 9.104-1, which provides:

To be determined responsible, a prospective contractor must –

(a) Have adequate financial resources to perform the contract, or the ability to obtain them;

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c) Have a satisfactory performance record. A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of lack of relevant performance history, except as provided in 9.104-2 [special standards for particular acquisitions];

(d) Have a satisfactory record of integrity and business ethics.

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104-3(a) [ability to obtain resources]).

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104-3(a)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations (see also inverted domestic corporation prohibition at 9.108).

48 C.F.R. § 9.104-1; Afghan Am. Army Servs. Corp. v. United States, 106 Fed. Cl. 714, 726-29 (2012); see Bender Shipbuilding & Repair Co., Inc. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002). As such, a finding of responsibility is largely a judgment call on behalf of the contracting officer, who is "the arbiter of what, and how much, information he needs." See John C. Grimberg Co., Inc. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999).

In making an affirmative responsibility determination regarding Pernix, Contracting Officers Lai and Thomas reviewed Pernix's technical capability and relied on a Dunn & Bradstreet report to assess Pernix's financial capability. AR 1058. With respect to technical capability, the Contracting Officers wrote:

Pernix is not listed on the GSA/OAP List of Parties Excluded from Federal Procurement and Non-Procurement Programs dated June 6, 2015. A Federal Awardee Performance and Integrity Information System (FAPIIS) report search revealed that the company has no record counts of negative past performance (i.e. defective pricing, DoD Determination of Contractor Fault, Non-Responsibility Determination, Termination for Cause/Default, and so on).

In the area of past performance, [Pernix] has performed satisfactorily on similar contracts for projects of the comparable size, magnitude, and complexity with the Department of State.

AR 1057.

With respect to financial capability, the Contracting Officers wrote:

The Dunn & Bradstreet (D&B) report on Pernix revealed a "4A" financial strength rating, reaching between $10-$50 million, and that is considered High. Under predictive analytics, Pernix is classified at "2," which represents a failure rate of .09% and is considered low. This financial stress class indicates that the firm shares some of the same business and financial characteristics of other companies with this classification. It does not necessarily mean that the firm will experience financial stress. The credit score class is "2," which shows that 2.5% of firms with this classification paid one or more bills severely delinquent, and it is noteworthy that the composite credit appraisal is rated fair. The D&B viability rating score of 4A3 indicates that Pernix has low risk for probability of becoming no longer viable than other companies in the same region and industry.

AR 1058. DOS thus provided a coherent and informed judgment based on the information before the Agency. Id. at 1057-58. The explanation provided by the Agency was factually supported by Pernix's proposal and past performance examples of similar comparable projects, as well as the Dunn & Bradstreet report on Pernix's financial capability. Id. The Contracting Officers examined all the relevant data and properly exercised their discretion in finding Pernix responsible. Bender Shipbuilding & Repair Co., Inc., 297 F.3d at 1362 (citing Impresa, 238 F.3d at 1334-35 (Fed. Cir. 2001)). The misleading discussions and uninformed pricing do not impact Pernix's overall financial wherewithal to perform. The Court thus finds that the Agency did not abuse its discretion in finding Pernix responsible. See Afghan Am. Army Servs. Corp., 106 Fed. Cl. at 728-29 (2012).

## A Narrow Injunction is Warranted

Permanent injunctive relief is an exceptional remedy only available to a disappointed bidder in limited circumstances, but ultimately is an act of equitable discretion by the trial court. eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); Apple Inc. v. Samsung Elecs. Co., Ltd., 809 F.3d 633, 639 (Fed. Cir. 2015); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). To obtain permanent injunctive relief, Caddell must show that (1) it has succeeded in on the merits of the case; (2) it will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) a grant of injunctive relief serves the public interest. eBay, 547 U.S. at 391; PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed Cir. 2004); AshBritt, 87 Fed. Cl. at 378. No individual factor is dispositive, but the Court must weigh each factor against the magnitude of the injunctive relief requested. Standard Havens Prods. v. Gencor Indus., 897 F.2d 511, 513 (Fed. Cir. 1990) (citing Hilton v. Braunskill, 481 U.S. 770, 778 (1987)). The Court is not required to weigh each factor equally, and a strong showing of success on the merits can overcome weaknesses with respect to the other four factors. FMC, 3 F.3d at 427. If warranted, injunctive relief will be issued upon a showing by a preponderance of evidence. Rush Constr.,

Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); Career Training Concepts Inc. v. United States, 83 Fed. Cl. 215, 218-19 (2008). [21]   The Court addresses each factor in turn.

First, as discussed above, Caddell has shown success on the merits of its case by a preponderance of the evidence by proving arbitrary and capricious Agency conduct as well as several violations of the FAR.   DOS conducted misleading discussions with Pernix, advising Pernix that its price was high when in fact it was low.   AR 895.   Caddell has further shown that DOS' price verification was inadequate and perpetuated DOS' original error.   There was an uneven playing field.   It was quintessentially arbitrary and capricious for the agency to tell Pernix its price was slightly above the IGE when in fact it was [***] below the IGE, especially when the agency had concerns about Pernix's ability to perform at that price.   These arbitrary and capricious misleading discussions snowballed into a more pervasive violation when Intervenor took the Government's cue and further lowered its price, and received award at a price based upon misinformation.   Given that the award price was based on misinformation, but neither the awardee nor the Government (at the time of award) knew it, the Government was incapable of assessing whether Pernix's offer price was fair and reasonable as required by FAR 15.404-1.   The Government sought verification of what it did not know was an invalid price. The attempted verification was a sham both from the perspective of the awardee and the Government because the awardee was never told the correct information about its initial pricing. Given these prejudicial Agency errors, Caddell succeeded on the merits of this protest.

Second, Caddell was irreparably harmed by this flawed procurement process. Absent injunctive relief, Caddell and all other qualified offerors would be denied the chance to compete on a level playing field.   The Court of Federal Claims has repeatedly recognized that the harm of being deprived of the opportunity to compete fairly for a contract is irreparable.   AshBritt, 87 Fed. Cl. at 378-79; United Payors & United Health Servs. v. United States, 55 Fed. Cl. 323, 333 (2002).   As such, this factor weighs in favor of granting an injunction to ensure a fair competition for this award and restore the integrity of the procurement process.   AshBritt, 87 Fed. Cl. at 379.

---

[21]   Defendant and Intervenor rely on KSEND v. United States to support applying a "clear and convincing" standard of proof to obtain injunctive relief, but such a high standard is not required.   69 Fed. Cl. 103, 112 (2005), aff'd on other grounds, 184 F. App'x 956 (Fed. Cir. 2006) (per curiam, nonprecedential).   Rather, as the Textron Court noted, "[a]lthough some judges of the Court of Federal Claims insist upon the higher 'clear and convincing' standard for injunctive relief, this court repeatedly has noted that such an approach is utterly without binding precedential support."   74 Fed. Cl. at 287 (referencing Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723 (2004)).   The reasoning behind applying the "preponderance of the evidence standard was articulated in Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 219 (2008):

> Utilizing the easier to prove, prevalent in civil cases, standard of proof of a preponderance of the evidence is more user friendly to the parties and furthers the public policy goal of open, accessible and fair government procurement in which each offeror becomes a participant and ombudsman to ensure those goals.

See also Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 159 (2005); Hunt Bldg Co., Ltd. v. United States, 61 Fed. Cl. 243, 279 (2004).

Third, the Court must balance the harms to Caddell against the harm to both the Government and the awardee were the Court to grant the injunction. Pernix did nothing wrong in participating in this procurement, and will be harmed by an injunction that prohibits the Agency from proceeding with the award. Although Pernix itself followed the rules, the Government made a fundamental procurement error here that skewed the playing field and resulted in an invalid award price and compromised the integrity of the procurement process. All offerors – including the awardee – were harmed by the error. The harms to the public interest and the integrity of the process outweigh the harm to Pernix of being deprived of this award.

As for the Government, DOS argues that it will suffer hardship from further delaying the construction of the New Embassy because the current embassy is suffering from "critical security flaws" that expose its employees to "unnecessary security risks." Def.'s Suppl. Br. 14. As explained below, the Court has taken this concern into account in fashioning limited injunctive relief which can be effected expeditiously.

It is "beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 572 (1999) (citing Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 269 (1997). In granting an injunction in a bid protest, the Court must consider the "overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." AshBritt, 87 Fed. Cl. at 397 (quoting CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004) (citing United Int'l Investigative Servs. v. United States, 41 Fed. Cl. 312, 323 (1998), aff'd, 163 Fed. Appx. 853 (Fed. Cir. 2005))).

In order to achieve a level playing field here, the Agency must cure its misleading discussion with Pernix and afford Pernix the opportunity to revise its price based upon an accurate indication of where Pernix's pricing stood vis-à-vis the IGE. This Court recognizes that ordinarily "where an agency reopens discussions with one offeror after the receipt of [final proposal revisions], it must afford all offerors in the competitive range an opportunity for reopened discussions." Lockheed Martin Simulation, Training & Support, B-292836.8, B-292836.9, 2004 WL 3217797, at *6 (Comp. Gen. Nov. 24, 2004); Int'l. Res. Grp., B-286663, 2001 WL 206074, *4 (Comp. Gen. 2001). However, in the instant case, such a broad reopening of discussions is unnecessary to cure the procurement error and would cause more harm than good. This is not a case of a misleading discussion that impacted any offeror other than Pernix. The other offerors had a fair shot at revising their final pricing proposals, and it would be unfair to give them another bite at the apple, especially given that all the other offerors now know the IGE and Pernix's final award price, but Pernix does not know their prices.

Defendant argues that the public interest "strongly disfavors injunctive relief" in the form of DOS re-conducting any aspect of the procurement particularly considering that Pernix's final offer and the IGE have now been made public. Def.'s Suppl. Br. 14-15. Defendant reasons that public knowledge of the award price and IGE makes it "almost certain that the price of the contract would be driven even lower, perhaps significantly, which would only increase any concern that the awardee could perform the contract requirements at the eventual award price." Id. at 15. The IGE was apparently released in the redacted version of Plaintiff's Motion for Judgment on the AR, even though the IGE had been redacted from the AR and all other filings as

Protected Information.  This release was not sanctioned by the Court and will be addressed in further proceedings.  Release of the IGE and Pernix's price supports reopening discussions solely with Pernix.  This limited injunction will not, as Defendant suggests, necessarily drive Pernix's price lower, because Pernix will learn that its original price was not [***] vis-à-vis the IGE, but low, and that its revised price was [***] lower – 16.6% – than the IGE.  Further, the process of sending Pernix a new discussion letter and requesting a revised price can be done expeditiously.[22]

The Federal Circuit's decision in Chapman Law Firm Co. v. Greenleaf Construction Co. does not require reopening discussions with all offerors here.  490 F.3d 934, 938 (Fed. Cir. 2007).  In Chapman, the Federal Circuit affirmed the Court of Federal Claims' decision that the Agency's corrective action of reopening discussions with only a single offeror was error because it excluded a qualified small business from the competition.  Id. at 940.  The limited reopening of discussions here has no such harmful discriminatory impact on any qualified offeror.  Rather, this injunction corrects an erroneous discussion with Pernix without favoring other offerors, who had the benefit of accurate discussions and now know both Pernix's price and the IGE.  Indeed, reopening discussions with all offerors and soliciting revised prices would unfairly harm Pernix, given the disclosure of its price and the IGE, and would cause more delay to the procurement.

As this Court is granting Caddell's request for injunctive relief, which restores Caddell's opportunity to receive a fair reevaluation of its offer, the Court denies Caddell's request for bid preparation and proposal costs.  Reema Consulting Servs., Inc. v. United States, 107 Fed. Cl. 519, 533 (2012) ("It follows, a fortiori, that if plaintiff . . . hopes to receive the award in question, and must do so regardless of whether [the Agency] evaluated its first offer properly vel non, it cannot obtain bid and preparation costs for that first proposal."); Beta Analytics Int'l Inc. v. United States, 75 Fed. Cl. 155, 159 (2007) (citing Heyer Prods. Co. v. United States, 140 F. Supp. 409, 413-14 (Ct. Cl. 1956)).

## Order

1.  The Court **GRANTS** Plaintiff's request for declaratory judgment and motion for a permanent injunction as follows:[23]

   a.  The Court hereby declares that the Department of State's selection of Pernix Group, Inc. under Solicitation No. SAQMMA-14-R0073 is null and void, and the June 15, 2015 selection of Pernix is hereby set aside;

---

[22]     This is evidenced by Pernix's ability to verify its price within approximately four hours in response to the Agency's verification request.  AR 1052-53.  To the extent other offerors need to extend their offers, this can also be done expeditiously.

[23]     In fashioning limited injunctive relief here, the Court is cognizant of its role to abstain from "undue judicial interference with the lawful discretion given to agencies" and its obligation to give due regard to national security concerns.  28 U.S.C. § 1491(b)(3); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1384 (Fed. Cir. 2009) (citing Norton v. S. Utah Wilderness All., 542 U.S. 55, 67 (2004)).

b. The Department of State, its officers, agents, servants, employees, representatives, and any person acting in concert and participating with them respecting the subject procurement, be and they are hereby **PERMANENTLY RESTRAINED AND ENJOINED** from proceeding to perform the contract awarded to Pernix in June, 2015, under Solicitation No. SAQMMA-14-R0073 for the construction of a new embassy compound in Maputo, Mozambique, and shall reopen the procurement as specified below;

c. Pernix Group, Inc., its subsidiaries, agents and assigns, be and they are hereby **PERMANENTLY RESTRAINED AND ENJOINED** from executing, receiving, and performing the contract awarded on June 15, 2015;

d. The Department of State is ordered to re-open this procurement to issue a corrected discussion letter to Pernix identifying the error in its prior discussions, conveying accurate information, and requesting Pernix to re-submit a final revised pricing offer in place of its May 4, 2015 offer;

e. If necessary, the Department of State may request offerors to extend their offers for a reasonable time in order to re-evaluate offerors' pricing;

f. Following issuance of Pernix's corrected discussion letter and receipt of Pernix's revised final offer, the Department of State shall reevaluate the offerors' final pricing proposals in accordance with this Court's Opinion, and make a new award decision under Solicitation No. SAQMMA-14-R0073.

2. Plaintiff's request for bid preparation and proposal costs is **DENIED**.

3. The parties shall file a Notice to the Court by **February 5, 2016**, indicating whether the IGE was Protected Information and addressing the propriety of Plaintiff's disclosure of the IGE in its redacted Motion for Judgment on the Administrative Record, ECF No. 31, at 21.

4. Prior to the release of this opinion to the public, the parties shall review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information. The parties shall file proposed redactions of this decision by **February 8, 2016.**

5. Plaintiff's Motion for Judgment on the Administrative Record is **GRANTED in part**, Defendant's Cross-Motion for Judgment on the Administrative Record is **DENIED**, and Intervenor's Cross-Motion for Judgment on the Administrative Record is **DENIED**. The Clerk shall enter judgment on the Administrative Record in favor of Plaintiff consistent with this opinion.

6.  The case shall remain open, and the Court will retain jurisdiction for further ancillary proceedings consistent with this opinion.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**